W. J. USERY, Jr., Secretary of Labor, United States Department of Labor

v.

BOARD OF EDUCATION OF BALTIMORE COUNTY.

Civ. No. K–76–672.

United States District Court, D. Maryland.

Sept. 28, 1978.

Carin Ann Clauss, Sol. of Labor, Washington, D. C., Marshall H. Harris, Regional Sol., Jay S. Berke, Karen Kress Weisbord, U. S. Dept. of Labor, Philadelphia, Pa., Russell T. Baker, Jr., U. S. Atty., Catherine C. Blake, Asst. U. S. Atty., Baltimore, Md., for plaintiff.

J. Carroll Holzèr, County Sol. and Joseph Kiel, Asst. County Sol., Baltimore, Md., for defendant.

**FRANK A. KAUFMAN, District Judge.**

The Secretary of Labor (plaintiff) alleges that the Board of Education of Baltimore County (defendant) violated the Equal Pay Act[1] ("Act") by paying female custodial workers in its schools a lower wage than male custodial workers performing substantially equal work.

The Board is responsible for the operation of approximately 160 elementary and secondary schools in Baltimore County. In connection therewith the Board establishes educational policies, prescribes rules and regulations for the conduct and management of the county school system, issues policy guidelines, purchases supplies, handles payroll and bookkeeping functions, fixes compensation of all employees subject to funding by the Baltimore County Executive and County Council, and assigns all personnel.

The Board concedes that its activities were performed through unified operation and control and are deemed to be for a common business purpose within section 3(r) of the Fair Labor Standards Act. The Board also concedes that the school system is a "single establishment" within the meaning of the Equal Pay Act.[2]

From 1964 to 1976, the Board utilized a job classification system under which all janitorial employees were categorized as Custodians I or Custodians II.[3] Custodians I, nearly all of whom were male,[4] received $.25 more per hour than Custodians II, most of whom were female.[5] The separate clas-

---

1. 29 U.S.C. §§ 206(d), 215(a)(2). The Equal Pay Act of 1963 is part of the Fair Labor Standards Act of 1938 (FLSA), 29 U.S.C. § 201 *et seq.*

2. 29 U.S.C. § 203(r).

3. There were originally three (3) levels of Custodial personnel. This was changed to the present two (2) levels in 1964 (Mitchell, Tr. at 778–79).

4. The break down of all full-time Custodians I, by year, was as follows:

| | | |
|---|---|---|
| 1972 | 558 males, | 1 female |
| 1973 | 575 males, | no females |
| 1974 | 573 males, | 3 females |
| 1975 | 571 males, | 2 females |

(Legum, Tr. at 621–24).

5. The break down of all full-time Custodians II, by year, was as follows:

sifications and the wage differentials were eliminated by the Board in July, 1976, shortly after this suit was filed. The Board contends that the tasks performed by the two categories of custodians were significantly different and unequal. The Board also asserts that the Secretary is estopped from pursuing relief in this case because of the manner in which the federal agency conducted its investigation of the Baltimore County schools.

The Secretary seeks a permanent injunction enjoining the Board from violating the Act and the payment of back wages to the Board's female employees for school months during the period from May 7, 1974 through July 1, 1976, with interest, at the rate of six percent per annum.

Prior to trial, the parties took depositions *de bene esse* of 39 custodial employees. Those depositions have been admitted into evidence and are part of the record. In a non-jury trial held during the week of February 27, 1978, 11 additional custodians, certain Board of Education officials, a Department of Labor investigator assigned to the case, and several expert witnesses, testified.

Jurisdiction exists pursuant to section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217.

## I—AGENCY ESTOPPEL DEFENSE

Defendant argues that plaintiff is estopped from prosecuting this case because of alleged failure by the Department to follow its own regulations and procedures. Defendant relies heavily on the Department of Labor's Field Operations Handbook (FOH). The estoppel defense has two prongs:

(1) Contrary to Section 53b01 of the FOH, the Labor Department's compliance officer failed to conduct a "final conference" to inform the Board of the results of his investigation and to attempt to obtain future compliance; and

(2) Institution of this suit for back wages and injunctive relief after the Board had commenced compliance with the Act violated the Department's policy as stated in section 81b03 of the FOH.

In response, the Secretary contends that the evidence does not support those estoppel contentions and that, in any event, neither estoppel defense is legally viable.

### A. The Investigation

In May 1973, Gary Legum, Compliance Officer of the Wage and Hour Division of the Department of Labor, began an investigation into the employment practices of the Board. Legum first contacted Thomas Regan, a specialist in the Board's personnel department, and asked Regan for information regarding the Board's personnel and pay policies. After visiting three of the Board's 160 schools and talking with various employees, Legum again met with Regan and at that time informed him that the Board was violating the Equal Pay Act with respect to some of its custodial employees. Regan requested that Legum put his findings in writing. In a letter dated May 30, 1973, Legum wrote Regan that the lower-paid female custodians were doing work substantially equal to that of the higher-paid male custodians.[6]

Subsequently, Legum met on June 18, 1978, with Dr. Joshua R. Wheeler, Superin-

---

| 1972 | 462 females, | 62 males |
| 1973 | 467 females, | 63 males |
| 1974 | 472 females, | 54 males |
| 1975 | 456 females, | 23 males |

(Legum, Tr. at 621–24).

**6.** Legum wrote in part:

In response to your request of May 25, 1973 outlining the determinations of violation from the Wage and Hour investigation of the Board of Education of Baltimore County, the following practices have been found to be contrary to * * * the Equal Pay Act.

\* \* \* \* \* \*

Violations of the Equal Pay Act were found with respect to female custodians (Custodian II) as compared with male custodians (Custodian I). These employees were found to be performing work requiring substantially equal skill, effort and responsibility. It is noted that the entire Custodian I work force is male and Custodian II is 90 percent female.

An early reply with regard to future compliance as to the above items would be appreciated.

tendent,[7] Dr. Robert Y. Dubel, the Deputy Superintendent, and other Board representatives to attempt to settle their differences. At the meeting Wheeler said that he felt the wages of the female cu..todians should be increased but that he did not believe their work to be equal to that of the male custodians. Wheeler also asserted that Legum had not visited a sufficient number of schools to obtain an accurate picture of the Board's personnel policies.[8] He asked that Legum expand his investigation to include other schools.

After consulting with his supervisor, Legum visited three more schools during June and July, 1973. At trial, Legum testified that the additional investigation supported his original finding of an Equal Pay Act violation. He met with Board officials a second time on July 13, 1973 and informed them again of his conclusions. He modified his original findings by noting that in some schools male custodians appeared to spend substantial time during the summer on work not comparable to work done by female custodians.[9] However, he reiterated his belief that there existed a violation of the Act in those schools during the school year.[10] Wheeler responded by again requesting a more thorough investigation. He reasoned that, since Legum had found possible differences in work performed by

7. Dr. Wheeler was Superintendent until June 30, 1976, after which Deputy Superintendent Dubel assumed the superintendent's post.

8. Wheeler incorporated those views in a letter dated June 16, 1973 addressed to Legum which read, in pertinent part:

> I have your letter of May 30, 1973 in which you have suggested that certain employment and personnel practices may be contrary to * * * the Equal Pay Act.
> In response we submit the following:
> \*      \*      \*      \*      \*      \*
> 3. *Classification of Custodial Employees* —In our judgment there is complete justification for two classifications of custodial employees—Custodian I and Custodian II. The job description clearly states that Custodian I's are expected to perform certain more rigorous and hazardous work and in our judgment they are, in fact, doing this on a very substantial basis. We believe it would be a great injustice to our employees to eliminate this pay distinction, thereby granting supervisors the authority to assign this more rigorous and hazardous work on a purely subjective basis. We believe that your visit to less than 2% of our installations does not constitute a reasonable examination of existing conditions, and ask that a more complete examination of this be conducted by your office. I trust we will hear from you regarding this.
> If there are other questions regarding our employment practices please do not hesitate to contact me regarding them.

9. The Secretary now contends that Legum was incorrect in his assessment that summer work at some schools might not be equal. Although the Secretary presently argues that the Board was in violation of the Act during the summer months as well as the school term, the Secretary is seeking back wages in this case only for work performed during the school term.

10. Legum restated his findings in a letter to Wheeler dated July 18, 1973:

> In accordance with our conversation in the meeting of July 13, 1973, the following steps are necessary for the Baltimore County school system to come into compliance with the Equal Pay Act.
> During the time when school is in session all wage differentials between males in the Custodian I classification and the females in the Custodian II classification must be eliminated in those schools that employ both classifications of employees. During the summer vacation all wage differentials between the males and females in the Custodian I and II classifications respectively must be eliminated where comparable jobs are being performed by males and females. As we discussed, in some schools during the summer males are spending substantial time working on cleaning, waxing and buffing machines and/or working in boilers. If all of the males in a school perform such work they would not be considered to be performing comparable work to the females and, therefore, in such locations no equal pay violation would exist in the summer. This would not allow, however, for a year round wage differential, only a differential during the summer when comparable work was not being performed. If any male custodian is not spending substantial amounts of time in the non-comparable work, but rather is cleaning floors, windows, furniture, venetian blinds, etc. he is performing comparable work to that of the females and in those schools a wage differential is a violation of the Equal Pay Act and must be eliminated. In summation, to come into compliance with the Equal Pay Act, Baltimore County schools must eliminate wage differentials between male and female custodians when they perform comparable work in the same school. Comparable work is being performed during the school year at all schools and is being performed at some, if not all locations, during the summer.

male and female custodians during the summer months as a result of visits to schools during June and July, additional visits during the school term might yield similar conclusions for the rest of the year.[11]

Legum testified that on August 9, 1973 he telephoned Wheeler concerning the latter's request for additional investigation,[12] and informed the superintendent that the investigation was "inconclusive" as to work performed during the summer months. However, Legum stated that Equal Pay Act violations existed during the school term and that additional investigation would not be fruitful. According to Legum, he warned Wheeler that if the Board continued to refuse to comply, Legum would submit the file to his superiors for potential litigation.

Legum in fact did refer the file to the Solicitor of Labor for potential litigation. The Solicitor's office returned the file to Legum with instructions to investigate additional schools. Legum then visited six more schools during February-May, 1974, and five schools during October-November, 1974.

During his 1974 investigation Legum apparently did not contact Wheeler. Rather, he dealt with Donald E. Custer, Supervisor of the Board's office of Building Maintenance and Operations, who prepared a letter of introduction and assisted Legum in gathering information. After the additional fact finding, Legum informed Custer that the Board was still in violation of the Equal Pay Act. According to Legum, Custer indicated that the Board would not alter its position and would not comply in accordance with Legum's views. Custer testified at trial that he merely stated to Legum that he (Custer) personally did not agree with Legum's findings. Custer seemingly did not have any express authority from the Superintendent's office to state the Board's position.[13] In fact, Custer did not apprise the Superintendent's office of Legum's visit or of the compliance officer's conclusions.

11. Thus, on July 30, 1973, Wheeler wrote to Legum:

I am writing in response to your letter of July 18, 1973 in which you state that, in your opinion, there are certain actions which the Board of Education of Baltimore County should take "to come into compliance with the Equal Pay Act."

At our conference of June 18, 1973, we expressed the opinion that your examination of job performances by custodians in three schools represented an inadequate sampling of our job assignments and performances for Custodians I and II. You agreed at that time to visit additional schools before making your final recommendations. Your letter of July 18, 1973 apparently reflects your observations from this second series of visits. You have concluded the following: "If all of the males in a school perform such work they would not be considered to be performing comparable work to the females, and, therefore, in such locations no equal pay violation would exist in the summer. This would not allow, however, for a year around wage differential, only a differential during the summer when comparable work was not being performed."

It appears that in conceding differences in work performances produced by Custodians I and II during the summer months, you have moved in the direction of approving our method of classifying these jobs. You conclude, however, that the job performances are substantially the same during the approximately nine and one-half months each year that schools are in regular session. Obviously, this conclusion could only be based on your first round of visits to three schools.

Thus, we have come full circle and are exactly where we were on June 18, 1973 when we apparently convinced you that you had made the conclusions contained in your letter of May 30, 1973 on the basis of limited observation and insufficient data. Therefore, we are renewing our request that you conduct a more thorough investigation of this situation during the time of the year about which we still appear to have a difference of opinion, namely, the regular school session.

We are hereby requesting, therefore, that you visit a significant number of additional schools after September 6, 1973 when our pupils are in regular session. We will be pleased to assist you in arranging such visits.

12. Wheeler testified that he did not remember the telephone conversation, but could not deny that it occurred.

13. At trial Dr. Dubel described Custer's supervisory position as "middle management". He asserted that Custer had no authority to state the Board's position, but only "to cooperate with Mr. Legum in arranging visits to schools". Compliance Officer Legum testified that he had assumed Custer was speaking for the Board of Education.

Apparently, after the August 9, 1973 telephone conversation between Legum and Wheeler, the superintendent's office received no direct word of the Labor Department's investigation until the spring of 1975. In a letter dated March 21, 1975, the Regional Solicitor of Labor wrote the superintendent that the investigation had been completed and that the matter had been referred to the Solicitor's Office "for consideration of appropriate action in accordance with the provisions of law."

Dr. Dubel testified that, prior to receipt of the Solicitor's letter, he and Wheeler had inferred from the Labor Department's apparent silence that the government had either dropped the investigation or had not yet completed its fact-finding.[14]

Dubel and other Board officials then met with a representative of the Regional Solicitor on April 30, 1975 and restated the Board's position that the work was unequal. The result of that meeting was apparently inconclusive. About a year later on March 5, 1976, another meeting was held in Baltimore between Labor Department attorneys and Board officials. At that meeting Wheeler and Dubel agreed to merge the custodial classification and to eliminate the existing pay differentials at a cost of $270,-000. Dubel testified that it was at this 1976 meeting that the Board members themselves first learned of the compliance officer's additional 1974 investigations and visits arranged by supervisor Custer. The Board members requested that the Labor Department forego any demand for back wages for the female custodians. In a letter dated March 10, 1976, the Regional Solicitor rejected that request and, two months later, filed the within suit.

### B. The Field Operations Handbook

The Board argues that this chronology reveals that the compliance officer failed to comply with procedures set forth in two sections of the Labor Department's Field Operations Handbook (FOH).[15]

First, section 53b01 of the FOH provides a basic outline for a final conference to be held between a compliance officer and an employer upon the completion of the fact finding phase of an investigation. At such a conference, the compliance officer is to inform the employer of the results of the investigation, explain the steps necessary for compliance if violations are found, and attempt to obtain an agreement for future compliance.[16]

14. Dubel testified:
Q Now, for the period of time between July 30 of 1973 to the time of the communication dated March 21, of '75 was received, where did you feel that the matter lay?
A Well, we made an assumption: One, that the Labor Department had either dropped the case or that they were still conducting investigations and had delayed to pursue the case, and this was well within time frames and well within our past practice in working with the many agencies in the federal government. We find particularly that personnel change and folders seem to go from office to office and quite often we don't hear for many months. We just seem to have no ability sometimes to communicate, and our procedure is as if they are pressing an issue to wait until such time they contact us again, so we simply had to assume that we were relying on this paragraph back in the letter of July 18, 1973 which said that they had found a difference in the summer. We had asked them to do more investigation and we didn't hear from them and we felt it was a reasonable inference that they had either dropped the thing or had not finished the investigation.

Tr. 857–58.

15. The parties have stipulated that the Field Operations Handbook is a publication prepared by the Administrator of the Wage and Hour Division of the Department of Labor and is not an interpretive bulletin.

16. Section 53b01 reads in full:
53b01 *Final conference.* (a) The following is a basic outline of the final conference to be conducted upon the completion of the fact finding phase of an investigation; this conference shall be held with the employer or his designated representative.
(1) Inform him of the investigation results.
(2) If violations were found, inform him of the steps necessary to comply, and give him any pertinent publications he does not have and which the CO believes he should have, or those he requests. As appropriate, the CO shall explain the laws involved; this should be done without disturbing practices which are not violative, such as payment of OT to employees who may be exempt.
(3) Ascertain the reasons for any violations and obtain an agreement to comply.

Another section of the FOH instructs the compliance officer to inform the employer of the "final conference" at their initial interview. Section 52a09 states in part:

52a09 *Initial employer interview.* (a) At his first interview with the employer (or his designated representative) the CO shall:

\* \* \* \* \* \*

(2) outline in general terms the scope of the investigation, including the examination of pertinent records, employee interviews, and the final conference with the employer or his designated representative to discuss the investigation findings;

\* \* \* \* \* \*

The Board concedes that Compliance Officer Legum substantially followed the directives of the FOH with respect to his 1973 investigation of six schools. However, it asserts that he neglected to hold any "final conference" or even to communicate with the Board following the 1974 investigation of eleven additional schools. The Board maintains that Custer, who was Legum's contact in the school system during the 1974 investigation, had no authority to speak for the Board. Thus, defendant reasons, Legum's conversations with Custer as the supervisor of building maintenance and operations did not: (1) apprise the Board of the

further investigation and its results, (2) advise defendant of the steps needed for compliance, or (3) constitute an attempt to obtain future compliance. The Board argues that its position regarding future compliance might have changed if it had been informed that Legum's further investigation reinforced his original conclusion.

In response, the Secretary maintains that the fact finding phase of his investigation ended in the summer of 1973. He urges that Legum's meeting with Board officials on July 13, 1973 at which the compliance officer stated his conclusions and delineated the steps necessary for compliance, along with his confirmatory telephone call to Wheeler, constituted the "final conference" described in the FOH. According to the Secretary, Legum's later visits to the school system in 1974 were for the purpose of gathering data for the Regional Solicitor's Office, to whom he had already referred the file.

Independently of the above, the defendant relies upon section 81b03, which states that if an employer alters its payroll practices to come into compliance, "ordinarily a complaint for a civil action will not be filed." [17] According to the FOH, an excep-

---

(4) If CL violations are found, give the employer *a copy of Form WH–103. (Note: If* current CL violations are disclosed, the employer should be· advised promptly without waiting for the final conference so that corrective steps can be taken immediately, such as transfer of the minor to permissible work.)
(5) If within the authority of the CO, negotiate payment of BW (except in potential litigation cases as set out in FOH 80a).
(6) If there are questions which the CO cannot answer, or if for any reason the investigation is being suspended or there will be a delay, the employer should be informed to the extent possible how to correct any known *violations and of the reasons for the delay.*
(7) Inform those employers covered by the ADEA, including those likely to be covered in the near future, of the Act's provisions and furnish the employer with the appropriate publications.

(b) In any case where an investigation cannot be brought to a conclusion within a reasonable time, the CO should advise the complainants, if practicable, of the delay and of their rights under Sec 16(b). Whether or not this has been

done shall be noted in the narrative, if one has been written, or *in the case diary otherwise.*
17. That section reads, in relevant part:
81b03 Civil injunction policy. (*a* ) As a general rule, the Division will use the remedy of an injunction only as a means of securing compliance when voluntary compliance has been refused. Whenever an employer refuses to come into compliance, the investigation shall be prepared for civil action.
(*b* ) If employer, either on his own initiative or as a result of conferences with representatives of the Division or of the Office of the Solicitor, changes his payroll practices so as to come into compliance with the FLSA without the necessity of suit, ordinarily a complaint for civil action will not be filed. This policy will be followed even though restitution has not been paid, and in child labor cases where no wilfulness is involved. However, an exception to the general rule will be made and suit filed, despite current compliance, if future compliance cannot be reasonably anticipated, because of the nature of the violations, prior investigation history, and so forth.
\* \* \* \* \* \*

tion will be made to that policy if, despite current compliance by the employer, future compliance with the Act cannot reasonably be anticipated. At trial, Legum testified that he had no reason to doubt that, after the Board had eliminated the pay differential between categories of custodians, it would remain in compliance with the Act. The Board therefore contends that the filing of this suit was contrary to the Department of Labor's policy as stated in the FOH.

The plaintiff answers that section 81b03 was issued in December, 1955, when the Secretary did not have the power—as he does now—to seek back wages in an action under section 17 of the FLSA.[18] While the Secretary concedes that section 81b03 still appears in the FOH, he denies that it represents the current policy of the Department of Labor.

## C. *Accardi* Doctrine

The Board bases its defense on the principle that an agency is bound to follow its own rules and regulations. That principle was enunciated by the Supreme Court in *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954), and elaborated upon by the Fourth Circuit in *United States v. Heffner*, 420 F.2d 809 (4th Cir. 1969).

In *Accardi*, an alien, admittedly deportable, brought a habeas corpus action attacking the validity of the denial of his application for suspension of deportation. He claimed that his application to the Board of Immigration Appeals had been prejudged because, prior to the Board's decision, the Attorney General had included the alien on a confidential list of "unsavory characters" (347 U.S. at 262, 74 S.Ct. 499) whom he wished to deport. The question before the Supreme Court was whether the alleged conduct of the Attorney General deprived the alien of any rights guaranteed him by statute or by regulation.

Mr. Justice Clark, writing for a majority of five, first described (at 265–67, 74 S.Ct. at 502–03) certain regulations relevant to the case:

Regulations with the force and effect of law supplement the bare bones of [the Immigration and Nationality Act]. The regulations prescribe the procedure to be followed in processing an alien's application for suspension of deportation.

Until the 1952 revision of the regulations, the procedure called for decisions at three separate administrative levels below the Attorney General—hearing officer, Commissioner, and the Board of Immigration Appeals. The Board is appointed by the Attorney General, serves at his pleasure, and operates under regulations providing that: "In considering and determining . . . appeals, the Board of Immigration Appeals shall exercise such discretion and power conferred upon the Attorney General by law as is appropriate and necessary for the disposition of the case. The decision of the Board . . . shall be final except in those cases reviewed by the Attorney General. . . ." 8 CFR § 90.3(c) (1949). See 8 CFR § 6.1(d)(1) (Rev.1952). * * *

* * * The clear import of broad provisions for a final review by the Attorney General himself would be meaningless if the Board were not expected to render a decision in accord with its own collective belief. In unequivocal terms the regulations delegate to the Board discretionary authority as broad as the statute confers on the Attorney General; the scope of the Attorney General's discretion became the yardstick of the Board's.

And if the word "discretion" means anything in a statutory or administrative grant of power, it means that the recipient must exercise his authority according to his own understanding and conscience. This applies with equal force to the Board and the Attorney General. * * *

---

18. Section 17 was amended in 1961 to permit the Secretary of Labor to seek back wages as well as prospective injunctive relief in actions brought under section 17. *See* Pub.L.No.87–30 *amending* 29 U.S.C. § 217.

Mr. Justice Clark concluded that "as long as the regulations remain operative, the Attorney General denies himself the right to sidestep the Board or dictate its decision in any manner." *Id.* at 267, 7: S.Ct. at 503. The Court thus held that if the petitioner could prove his allegations that the Board had failed to exercise its discretion under the regulations, he would be entitled to a new hearing before the Board without the burden of the previous proscription by the Attorney General's list.

The Supreme Court subsequently applied the *Accardi* doctrine to invalidate discharges of federal employees when safeguards required by agency regulations were not provided. *See Vitarelli v. Seaton,* 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959) (Department of Interior was bound to provide hearing with procedural safeguards pursuant to a departmental order promulgated by the Secretary relating to discharges on national security grounds); *Service v. Dulles,* 354 U.S. 363, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957) (Secretary of State's dismissal of foreign service officer was contrary to the State Department's regulations applicable to loyalty discharges and therefore invalid). The Supreme Court has also reversed a conviction for contempt of the House Committee on Un-American Activities on the basis that the committee violated some of its own procedural rules designed for the protection of its witnesses. *Yellin v. United States,* 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963). *See also* 3 Mezines, Stein & Gruff, Administrative Law (1977) § 14.02; Note, *Violations by Agencies of Their Own Regulations,* 87 Harv.L.Rev. 629 (1974).

In *United States v. Heffner,* 420 F.2d 809 (4th Cir. 1969), Judge Winter applied the *Accardi* doctrine in the context of a criminal prosecution under the Internal Revenue Code. The IRS had issued instructions to its Special Agents regarding interviews with taxpayers during criminal investigations. The agents were instructed to produce their credentials during the initial contact with the taxpayer and to inform him that they were investigating the possibility of criminal tax fraud. The agents were also required to advise a taxpayer of his constitutional rights to remain silent and to retain counsel. The agent who interviewed Heffner failed to comply fully with those instructions because he never warned Heffner of the function of special agents nor did he tell Heffner of his right to retain counsel. Heffner was subsequently indicted and convicted on two counts of tax fraud.

On appeal, the Fourth Circuit reversed Heffner's conviction, holding that "[a]n agency of the government must scrupulously observe rules, regulations, or procedures which it has established." 420 F.2d at 811. In so doing, Judge Winter wrote:

It is of no significance that the procedures or instructions which the IRS has established are more generous than the Constitution requires.

\* \* \* \* \* \*

Nor does it matter that these IRS instructions to Special Agents were not promulgated in something formally labeled a "Regulation" or adopted with strict regard to the Administrative Procedure Act; the *Accardi* doctrine has a broader sweep. The Supreme Court in *Vitarelli v. Seaton, supra,* applied it to a Department of the Interior "Order." The Second Circuit has applied it to the Army's "Weekly Bulletin 42," § 4(c) (Oct. 20, 1967). *Smith v. Resor,* 406 F.2d 141, 143–144 & n. 2, 146 (2 Cir. 1969). The District of Columbia Circuit has applied the doctrine to a FCC "rule" which had not been formally promulgated but which the court found had been established by the FCC's "usual practice" of including the rule in its orders. *Sangamon Valley Television Corp. v. United States,* 106 U.S.App.D.C. 30, 269 F.2d 221, 224–225 & nn. 8 & 9 (1959). See also *McKay v. Wahlenmaier* [96 U.S.App.D.C. 313, 321,] 226 F.2d 35, 43 (D.C.Cir.1955) (alternative holding). The same court has also applied the doctrine to FCC "Standards." *American Broadcasting Co., Inc. v. FCC,* 85 U.S.App.D.C. 343, 179 F.2d 437, 442–443 (1949). Finally, in *United States ex rel. Brooks v. Clifford,* 409 F.2d [700] at

706, this court applied the doctrine to a Department of Defense "Directive."

These cases are consistent with the doctrine's purpose to prevent the arbitrariness which is inherently characteristic of an agency's violation of its own procedures. As the Second Circuit said in *Hammond v. Lenfest*, 398 F.2d [705] at 715, cited with approval in *United States ex rei. Brooks v. Clifford*, 409 F.2d at 706, departures from an agency's procedures "cannot be reconciled with the fundamental principle that ours is a government of laws, not men." The arbitrary character of such a departure is in no way ameliorated by the fact that the ignored procedure was enunciated as an instruction in a "News Release." The document purports to establish certain procedures which Special Agents are "required" to follow. Undoubtedly, a failure to comply is a rare event within the Intelligence Division—a fact which highlights the apparently inadvertent failure to give the required warnings here. Furthermore, a reversal here would not only have the salutary effect of encouraging IRS agents to observe their own procedures, L. Jaffe, Judicial Control of Administrative Action 369 (1965), cited with approval in *Smith v. Resor*, 406 F.2d [141] at 146, but would assist the IRS in fulfilling its own important stated purpose in requiring that the warnings be given. For the announcement of the instructions was coupled with the justification that they would insure "*uniformity* in protecting the Constitutional rights of all persons."

*Id.* at 812–13. *See also United States ex rel. Brooks v. Clifford*, 409 F.2d 700, 706 (4th Cir. 1969).

The principles of *Accardi* and *Heffner* have been reiterated on numerous occasions in this circuit [19] and elsewhere.[20]

In some circumstances, agencies have been permitted to depart from their regulations when those regulations were designed to govern internal agency procedures rather than to protect an interest of some other party. *See, e. g., American Farm Lines v. Black Ball Freight Service*, 397 U.S. 532, 90 S.Ct. 1288, 25 L.Ed.2d 547 (1970). In *American Farm Lines*, a motor carrier applied to the Interstate Commerce Commission for temporary operating authority. The ICC was permitted by statute to grant such authority when there is an "immediate and urgent need for service which cannot be met by existing carriers" (at 534, 90 S.Ct. at 1290, at which the applicable ICC regulation is quoted). Pursuant to its statutory power, the Commission had promulgated rules requiring detailed information in support of applications for a temporary operating authority. Although the motor carrier in *American Farm Lines* did not file as detailed a statement as required by the Commission's rules, the ICC eventually granted the authority. In a suit filed by competing carriers, the Supreme Court upheld the Commission's decision.

In his opinion for five members of the Court, Mr. Justice Douglas focused on a distinction between rules developed for the benefit of an agency and those promulgated for the protection of those who deal with an

**19.** *See, e. g., Mayor and City Council v. Mathews*, 562 F.2d 914, 922 & n.6 (4th Cir. 1977) (Winter, J.) (HEW's failure to issue guidelines to help recipients of federal funds comply with Title VI violated agency's regulations and prevented it from taking administrative action against recipients); *Morris v. McCaddin*, 553 F.2d 866, 870 (4th Cir. 1977) (Hall, J.) (National Guard required to follow its own technician personnel pamphlet in reassigning displaced technicians); *Electronic Components Corp. v. NLRB*, 546 F.2d 1088, 1090 (4th Cir. 1976) (Widcner, J.) (Enforcement of Board order denied because regional director failed to conduct investigation mandated by the Board's rules);

*United States ex rel. Coates v. Laird*, 494 F.2d 709, 711 (4th Cir. 1974) (Russell, J.) (failure of Marine Corps to state reasons why it denied petitioner's application for discharge as a conscientious objector was contrary to administrative regulations and thus invalidated that denial).

**20.** *See, e. g., Hollingsworth v. Balcom*, 441 F.2d 419 (6th Cir. 1971); *United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970); *Smith v. Resor*, 406 F.2d 141 (2d Cir. 1969); *Pacific Molasses Co. v. FTC*, 356 F.2d 386 (5th Cir. 1966); *Sangamon Valley Television Corp. v. United States*, 106 U.S.App.D.C. 30, 269 F.2d 221 (1959).

agency. In that vein, he wrote at 538–39, 90 S.Ct. at 1292:

> The Commission is entitled to a measure of discretion in administering its own procedural rules in such a manner as it deems necessary to resolve quickly and correctly urgent transportation problems. It is argued that the rules were adopted to confer important procedural benefits upon individuals; in opposition it is said the rules were intended primarily to facilitate the development of relevant information for the Commission's use in deciding applications for temporary authority.

We agree with the Commission that the rules were promulgated for the purpose of providing the "necessary information" for the Commission "to reach an informed and equitable decision" on temporary authority applications. ICC Policy Release of January 23, 1968. The Commission stated that requests for temporary authority would be turned down "if the applications do not *adequately* comply with [the] . . . rules." Ibid. (Emphasis added.) The rules were not intended primarily to confer important procedural benefits upon individuals in the face of otherwise unfettered discretion as in *Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012; nor is this a case in which an agency required by rule to exercise independent discretion has failed to do so. *Accardi v. Shaughnessy*, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681; *Yellin v. United States*, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778. Thus there is no reason to exempt this case from the general principle that "[i]t is always with-

in the discretion of a court or an administrative agency to relax or modify its procedural rules adopted for the orderly transaction of business before it when in a given case the ends of justice require it. The action of either in such a case is not reviewable except upon a showing of substantial prejudice to the complaining party." *NLRB v. Monsanto Chemical Co.,* [8 Cir.,] 205 F.2d 763, 764. And see *NLRB v. Grace Co.,* [8 Cir.,] 184 F.2d 126, 129; *Sun Oil Co. v. FPC,* [5 Cir.,] 256 F.2d 233; *McKenna v. Seaton,* 104 U.S.App.D.C. 50, 259 F.2d 780.

Mr. Justice Douglas concluded that "[u]nlike some rules, the present ones are mere aids to the exercise of the agency's independent discretion." [21] *Id.* at 539, 90 S.Ct. at 1293.

The Fourth Circuit has also been careful to specify that the principles of *Accardi* and *Heffner* apply only (1) when the agency's regulations are designed to protect the party dealing with the agency and (2) when the agency's departure from those regulations results in prejudice to that party. Judge Winter stated it succinctly in *Mayor and City Council v. Mathews*, 562 F.2d 914, 922 n.6:

> * * * Federal agencies will be held to strict compliance with their own regulations and rules of procedure, when a failure to observe them results in prejudice to a party they were designed to protect. *EEOC v. General Electric Co.,* 532 F.2d 359, 371 and n.37 (4th Cir. 1976); *McCourt v. Hampton,* 514 F.2d 1365, 1370 (4th Cir. 1975); *United States v. Heffner,* 420 F.2d 809, 811–12 (4th Cir. 1970).[22]

---

**21.** That distinction is exemplified by a comparison of the cases of *United States v. Leahey,* 434 F.2d 7 (1st Cir. 1970) and *United States v. Lockyer,* 448 F.2d 417 (10th Cir. 1971). In *Leahey*, IRS special agents failed to observe the IRS' announced procedure of warning a taxpayer that they were investigating criminal tax fraud and advising him of his rights to remain silent and to obtain counsel. Judge Coffin held that the IRS was bound by its publicized procedure designed to protect taxpayers and affirmed the district court's suppression of evidence. In *Lockyer*, an IRS agent, contrary to an unpublished provision of an IRS handbook, failed to turn over an investigation to IRS spe-

cial criminal agents as soon as fraud was suspected. Judge Doyle, distinguishing *Leahey* and (at 421) relying upon and quoting from *Leahey*, held that because the directive was unpublished and designed for internal administration, the taxpayer could not rely upon it to support his motion to suppress evidence. *See* 3 Mezines, Stein & Gruff, Administrative Law (1977) § 14.02 at 14–16 to 14–18.

**22.** *Cf. United States v. Musgrove,* 581 F.2d 406 (4th Cir. 1978) (possible failure of government attorneys to comply with Department of Justice guidelines on dual prosecutions would not invalidate conviction); *United States v. Wal-*

## D. Analysis

In this case, the Secretary relies on several cases in which the courts have held that the procedures set forth in the Field Operations Handbook and in the Department of Labor's interpretive bulletins are not binding on the Secretary. In *Brennan v. Ace Hardware Corp.,* 495 F.2d 368 (8th Cir. 1974), the Secretary instituted an investigation of the defendant and eventually filed suit under the Age Discrimination in Employment Act (ADEA). Although the district court found violations of the ADEA, it entered judgment for the employer because the Secretary had failed to comply with the statutory mandate to seek voluntary compliance through informal conciliation prior to bringing suit. The Eighth Circuit affirmed, holding that two personal meetings and one telephone call by the Secretary's compliance officer did not fulfill the statutory directive. However, in the course of so doing, Judge Gibson stated that the FOH guidelines for compliance officers did not establish rigid standards to which the Secretary would be held. Specifically, Judge Gibson wrote (at 376):

> * * * Stated in other words, does a violation of the handbook provisions constitute a *per se* violation of the Act concerning conciliation attempts? We generally agree with the Secretary that "[c]onciliation is notably an assignment to be played by ear" for "it requires flexibility and responsiveness to the attitudes of the other participants and to the developing positions taken by them in conversations." In this regard, courts would be unwise to hold the Secretary to rigid positions announced in the handbook as guidelines for the compliance officers. Handbooks should be ideally written to

allow for far-reaching guidelines to implement enacted provisions. In short, there should be a measure of safety written into the procedures to be followed. Courts would also lack prudence to dictate to the Secretary exactly how to perform his duties, which are expressly within the expertise of the Secretary and his department. Our decision affirms the conclusions reached by the District Court, not because the conciliation officer failed to abide by the rules of the handbook, but rather, we think, the statute itself required at least the performance of the affirmative actions by the Secretary to eliminate discriminatory practices and effect voluntary compliance through conciliation and persuasion that were described herein, but not attempted in this case.

The Government correctly argues that the handbooks cannot have the force or effect of regulations that are binding upon the Secretary. These handbooks are very similar to the handbooks in *Hawkins v. Agriculture Stabilization and Conservation Committee,* 149 F.Supp. 681 (S.D.Tex.1957), in which the court noted that the handbooks were not published in the Federal Register, were not intended by any government officials to have the force and effect of law, and were only guidelines for government personnel. That rationale applies here. In addition, since the handbook was the joint exhibit of the parties, the Government does not argue on appeal that its admission was prejudicial error.

Judge Gibson did not discuss or distinguish *Accardi* and its progeny such as *Heffner.* He did conclude that the district court did not abuse its discretion in entering judgment for the employer-defendant.[23]

---

den, 490 F.2d 372, 377 (4th Cir. 1974) (evidence held admissible because, *inter alia,* the violated regulation "expresses a policy for the benefit of the people as a whole, but not one that may fairly be characterized as expressly designed to protect the personal rights of defendants."). See *Brennan v. Ace Hardware Corp.,* 495 F.2d 368 (8th Cir. 1974); *Brennan v. Lord & Taylor, Inc.,* 76 Lab.Cas. ¶ 33,234 (SDNY1975); *cf. Marshall v. Krystal Co.,* 82 Lab.Cas. ¶ 33,603 (E.D.Tenn.1977) (denying discovery of FOH

and other instructional documents issued to compliance officers because such documents "were not intended . . . to have the force and effect of law, and were only guidelines for government personnel.").

**23.** This Court has held that the EEOC is bound by regulations which it has promulgated in furtherance of a statutory directive to seek conciliation. *See EEOC v. Westvaco Corp.,* 372 F.Supp. 985, 993–94 (D.Md.1974) (Blair, J.)

Unlike the ADEA, the Equal Pay Act contains no statutory provision requiring the Secretary to seek voluntary compliance before instituting legal action. However, Judge Gibson's characterization of the FOH voluntary compliance provisions as guidelines rather than enforceable rules appears equally applicable in this case.

In *Brennan v. Lord & Taylor, Inc.,* 76 Lab.Cas. ¶ 33,234 (S.D.N.Y.1975), the Secretary brought an action against the defendant for alleged Equal Pay Act violations at three of its department stores. Later the Secretary sought to amend the complaint to add a claim regarding a fourth store. The defendant contended that the Secretary's failure to comply with the conciliation provisions in his own Interpretive Bulletin with respect to the fourth store precluded him from amending the complaint. Judge Knapp began by stating that, while it was clear that the Secretary had not attempted to conciliate in accordance with his own regulation, 29 C.F.R. § 800.164, it was not clear what weight should be accorded in violation of such agency rules. Since neither the FLSA nor the Equal Pay Act contains any *statutory* conciliation requirement, the regulation purported to hold the Secretary to a higher standard of conduct than the statute. Judge Knapp also noted that 29 C.F.R. § 800.164 was not promulgated pursuant to any rulemaking authority granted in the FLSA and was therefore an "interpretive" rule without the effect of law. By contrast, he wrote, if the regulation were a "legislative" rule promulgated according to a statutory directive, then there would be no doubt that the Secretary was bound by it. *"Given a convincing show of prejudice,* the courts have held administrators to their regulations even in instanc-

es where the regulation requires of the agency a higher standard of conduct than the enabling statute . . . [citing *Accardi, Service, Heffner,* and other cases]." *Id.* at 46,935 (emphasis added; footnote omitted). In cases such as *Heffner,* "the courts were faced with a litigant who had or would shortly suffer grievously as a result of an administrative agency's failure to comply with its own established procedures." *Id.* at 46,936.

In *Lord & Taylor,* Judge Knapp found that the only conceivable prejudice suffered by the employer was the inconvenience of defending a lawsuit that could perhaps have been avoided. Such "prejudice" was not as severe as a threatened deportation (*Accardi*) or a criminal conviction (*Heffner*). Judge Knapp thus allowed the Secretary to amend his complaint to include the fourth store.

■ Under *Ace Hardware* and *Lord & Taylor,* the two provisions of the FOH relied upon by the Board in this case do not have the same force of law as "legislative" rules. However, consistent with *Heffner* and its kin, the Secretary is bound by those provisions if any deviation from them redounds to the prejudice of a party they were designed to protect.

The final conference required by section 53b01 of the FOH appears *designed* at least as much for the benefit of the Secretary as for the benefit of the employer under investigation. At the conference the compliance officer, after informing the employer of the results of the investigation, can attempt to achieve voluntary compliance and thereby relieve the government of the burden of potentially costly litigation.[24] Of course,

(EEOC actions "were bald and unambiguous violations of the plain language of its own rules" and also controverted conciliation provisions of Title VII); *EEOC v. Firestone Tire & Rubber Co.,* 366 F.Supp. 273 (D.Md.1973) (Miller, J.) (EEOC determination to sue could not stand because it was reached in violation of its own rules. Judge Miller noted (at 276) that one of the EEOC's regulations, "grants an important procedural benefit to the respondent . . . .")

24. *See Van Teslaar v. Bender,* 365 F.Supp. 1007, 1009–10 (D.Md.1973); *United States v. Goldstein,* 342 F.Supp. 661 (E.D.N.Y.1972). In *Van Teslaar,* Judge Miller held that a Coast Guard regulation requiring informal notice to a person of a complaint against him was promulgated for the purpose of providing relevant information for the investigating officer and *not to confer procedural benefits on individuals.* In *Goldstein* (at 668), Judge Judd concluded that certain pre-indictment conferences provided in IRS regulations "are primarily for the

the employer can also benefit from an opportunity to settle rather than litigate.

■ In any event, although the investigation that led to the institution and prosecution of the within case was not a model in terms of communication with the employer, the concerns of the "final conference" provision were adequately met. Even ignoring Compliance Officer Legum's contacts with Custer in 1974,[25] the Board's representatives were informed on several occasions both in person and in writing concerning the results of the 1973 investigation and the steps necessary for compliance. Although Dr. Wheeler did not recall the telephone call at trial, he did not directly or specifically contradict Legum's testimony that the compliance officer informed the superintendent by telephone that the investigation was over and the case had been referred to the Solicitor's office. Accordingly, this Court accepts Legum's testimony with regard thereto. The 1974 investigation, whether characterized as a continuation of the initial fact-finding or as research on behalf of the Solicitor's Office for this suit, did not alter the compliance officer's conclusions. Although it would have been the better practice for the compliance officer to have reiterated his conclusions to the superintendent, any additional "final conference" in 1974 would have almost surely been quite perfunctory.

Even assuming that a "final conference" should have been held after the 1974 visits, as in *Lord & Taylor* the defendant herein has suffered no prejudice other perhaps than the expense of litigating a possibly unnecessary lawsuit. Any relief granted by this Court in this suit would impose no greater burden on the Board than voluntary compliance in 1974. The injunction sought by the Secretary would merely order the

defendant to comply with the Equal Pay Act and to continue personnel practices which it has already voluntarily adopted. If the Board had come into compliance in 1974, it would have already paid all or most of the back wages sought in this action. Thus, other than expense of defending this suit, the Board can show no substantial prejudice due to the failure to hold an additional "final conference."

It is also to be noted that even if Legum did not comply with the FOH in this case, no substantial "prophylactic" purpose would be served by dismissing this case on that ground. *Cf. United States v. Walden*, 490 F.2d 372 (4th Cir. 1974).[26] In *Walden*, the defendants were convicted of violation of federal firearms statutes partially on the basis of evidence given by several enlisted Marines acting as undercover agents. The investigation contravened an "Instruction" issued by the Secretary of the Navy which prohibited the use of Navy and Marine Corps personnel to enforce local, state, and federal laws. On appeal, the defendants sought to have the convictions reversed on the ground that the evidence gathered by the Marines should have been excluded. The Fourth Circuit affirmed the convictions. Judge Winter observed that the Navy regulation was designed to restrict military involvement in civilian law enforcement—a policy that Congress had expressed in the Posse Comitatus Act with respect to other branches of the service. The violation of the regulation was apparently unintentional. Despite the violation of the regulation, Judge Winter, in the course of holding that a number of considerations counseled against application of the exclusionary rule, wrote (at 377):

Even though we sustain defendants' convictions, we have no reason to fear

benefit of the United States, to avoid the expenditure of effort on unfounded prosecution, and not for the benefit of defendants."

**25.** Under the circumstances of Legum's contacts with the Board, Custer may well have possessed apparent authority to state the Board's position. However, in view of this Court's determination that the contacts between Custer and Legum in 1974 are not crit-

ical to the resolution of the Board's *Accardi* defense, that question need not be reached.

**26.** *See also United States v. DeVaughn*, 414 F.Supp. 774, (D.Md.1976), conviction affd. without comment as to the Walden-type issue in a per curiam unpublished opinion, 556 F.2d 575 (4th Cir. 1977).

that others will be sought or obtained in violation of the Instruction now that we have expressed our view of its scope and effect. Nor is there reason to doubt that the military, now that we have declared the effect of the Instruction, will fail to take steps to provide a mechanism to enforce it.

For all of these reasons, we therefore decline to reverse defendants' convictions or to impose the extraordinary remedy of an exclusionary rule *at this time*. Should there be evidence of widespread or repeated violations in any future case, or ineffectiveness of enforcement by the military, we will consider ourselves free to consider whether adoption of an exclusionary rule is required as a future deterrent.

In the case at bar there is no indication that Legum intentionally violated the regulation in question, or that violations, intentional or otherwise, of the "final conference" directive are widespread.

█ The "civil injunction policy" set out in section 81b03 of the FOH states that the government generally will seek an injunction only when an employer has refused voluntary compliance—even when restitution (*i. e.*, back wages) has not been paid. That provision appears more directed toward conservation of government resources than protection or enforcement of any right

of employers under investigation. That policy, formulated at a time when the Secretary only had power to seek *prospective* relief in a section 17 suit,[27] seems antithetical to the remedy of back wages.[28] Adherence to such a policy, while sensible in terms of prospective relief, could effectively diminish the Secretary's statutory power to seek and insure payment of back wages to employees. In any event, given that section 81b03 of the FOH is not designed, at least primarily, to protect the employer, that it was not a published regulation, and that there was apparently no detrimental reliance by the Board upon the obsolete passage, the Secretary in this instance is not estopped from prosecuting this action due to any deviation from his own regulations. The Court will accordingly proceed to consider the merits of the case.

## II—MERITS

█ The Equal Pay Act of 1963 [29] prohibits an employer from discriminating "between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which he pays wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." Congress, "in prescribing 'equal' work did

---

27. See pp. 543–544, n.18 *supra*.

28. Such a policy might also impose a penalty on those employers who chose to litigate the validity of their policies under the Equal Pay Act rather than comply voluntarily. An employer who sincerely disputed the Secretary's assessment of equal work and who opted to litigate the matter could face a substantial liability for back wages if the Secretary turned out to be correct. By contrast, a similarly situated employer who consented to alter his personnel practices according to the Secretary's demands would incur no back wage liability. In addition, while such a policy would encourage voluntary compliance, it might also encourage delay. Further, if the Secretary would not generally sue for back wages, the employer might have an incentive to delay voluntary compliance as long as possible.

29. 29 U.S.C. § 206(d)(1). That section reads:

(d)(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: *Provided,* That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee.

not require the jobs be identical, but only that they must be substantially equal." *Schultz v. Wheaton Glass Co.*, 421 F.2d 259, 265 (3rd Cir.) *cert. denied*, 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970).[30] However, the Secretary has the burden of proving in a given case that the jobs in question require equal skill, effort, and responsibility, and that they are performed under similar working conditions. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 41 L.Ed.2d 1 (1974); *see generally* Sullivan, *The Equal Pay Act of 1963: Making and Breaking a Prima Facie Case*, 31 Ark.L.Rev. 544 (1978). Once the Secretary has established a prima facie case of unequal pay for equal work, the burden of proof shifts to the employer to show that the wage differential is based on one of the exceptions provided in the Act: (1) a seniority system; (2) a merit system; (3) a production incentive system; or (4) a differential based on any other factor other than sex.[31] *See Corning Glass Works v. Brennan, supra*, at 196–97, 94 S.Ct. 2223.

The Act provides no explicit criteria as to how the Secretary is to make out his prima facie case. However, in *Hodgson v. Fairmont Supply Co.*, 454 F.2d 490, (4th Cir. 1972), Judge Craven offered the following guidelines:

> ". . . [J]obs do not entail equal effort [and skill and responsibility], even though they entail most of the same routine duties, if the more highly paid job involves additional tasks which (1) re-

quire extra effort [and skill and responsibility], (2) consume a significant amount of time of all those whose pay differentials are to be justified in terms of them, and (3) are of an economic value commensurate with the pay differential."

454 F.2d at 493 [quoting from *Hodgson v. Brookhaven General Hosp.*, 436 F.2d 719, 725 (5th Cir. 1970).]. In *Brennan v. Prince William Hosp. Corp.*, 503 F.2d 282 (4th Cir. 1974), Judge Butzner, in the course of reviewing the case law under the Act, concluded that "[h]igher pay is not related to extra duties when one or more of the following circumstances exists: "

(1) "Some male employees receive higher pay without doing the extra work."

(2) "Female employees also perform extra duties of equal skill, effort, and responsibility."

(3) "Qualified female employees are not given the opportunity to do the extra work."

(4) "The supposed extra duties do not in fact exist."

(5) "The extra tasks consume a minimal amount of time and are of peripheral importance."

(6) "Third persons who do the extra task as their primary job are paid less than the male employees in question." 503 F.2d at 286. *See also Laffey v. Northwest Airlines, Inc.*, 185 U.S.App.D.C. 322, 343, 567 F.2d 429, 450 (1976).[32]

---

**30.** *See also Hodgson v. Miller Brewing Co.*, 457 F.2d 221, 227 (7th Cir. 1972); *Hodgson v. Fairmont Supply Co.*, 454 F.2d 490, 493 (4th Cir. 1972); *Shultz v. American Can Co.*, 424 F.2d 356, 360 (8th Cir. 1970).

**31.** *See* note 29 *supra*.

**32.** In *Laffey*, Judge Robinson stated (at 450): Often, evidence superficially purporting to justify greater pay as compensation for added work is found upon close examination to have inconsistencies which render its evidentiary value weaker. Where, for example, all male employees receive greater pay but only some perform the extra tasks allegedly justifying that pay, a reasonable inference is that maleness—not the added chores—is the basis for the higher wage. This is particularly true if the duties are of peripheral impor-

tance and the increase in pay is substantial. Moreover, if some women without added compensation render the same extra performance that purportedly justified the pay differential favoring men, the inference becomes even stronger that the duties are irrelevant to the wage setting. Similar evidence of discriminatory wage patterns is to be found where women are paid only for the amount of time actually spent on the extra work, but men are uniformly paid at the higher rate regardless of whether or not they are doing the work. Additionally the Fourth Circuit has found corroborative evidence that higher pay is not related to extra duties when

Regulations issued by the Department of Labor are also of aid in determining the criteria of the equality required by the Act. Those regulations provide in part:

*Equal Skill* :

\* \* \* Skill includes consideration of such factors as experience, training, education, and ability. It must be measured in terms of the performance requirements of the job. If an employee must have essentially the same skill in order to perform either of two jobs, the jobs will qualify under the Act as jobs the performance of which requires equal skill, even though the employee in one of the jobs may not exercise the required skill as frequently or during as much of his working time as the employee in the other job. Possession of a skill not needed to meet requirements of the job cannot be considered in making a determination regarding equality of skill. The efficiency of the employee's performance in the job is not in itself an appropriate factor to consider in evaluating skill.

29 C.F.R. § 800.125.

*Equal Effort* :

\* \* \* Effort is concerned with the measurement of the physical or mental exertion needed for the performance of a job. Where jobs are otherwise equal under the Act, and there is no substantial difference in the amount or degree of effort which must be expended in performing the jobs under comparison, the jobs may require equal effort in their performance even though the effort may be exerted in different ways on the two jobs. Differences only in the kind of effort required to be expended in such a situation will not justify wage differentials.

29 C.F.R. § 800.127.

*Equal Responsibility* :

\* \* \* Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation. Differences in the degree of responsibility required in the performance of otherwise equal jobs cover a wide variety of situations. \* \* \*

29 C.F.R. § 800.129.

*Similar Working Conditions* :

\* \* \* It should be noted that the statute adopts the flexible standard of similarity as a basis for testing this requirement. In determining whether the requirement is met, a practical judgment is required in the light of whether the differences in working conditions are the kind customarily taken into consideration in setting wage levels. The mere fact that jobs are in different departments of an establishment will not necessarily mean that the jobs are performed under dissimilar working conditions. This may or may not be the case.

29 C.F.R. § 800.131.

█ In this case the defendant Board has conceded that the Custodians I and the Custodians II performed their tasks under similar working conditions. The Board asserts, however, that the jobs were not otherwise equal and that the wage differential was based on a factor other than sex—*i. e.,* a bona fide job classification system. The burden is thus on the Secretary· to show that those jobs involved equal skill, effort, and responsibility.

### A. Job Descriptions

In arguing that the work performed by the two classes of custodians was basically unequal, the Board relies on job descriptions which it initially developed in 1964. The Board asserts that the wage differential was based on those job descriptions,

---

"qualified female employees are not given the opportunity to do the extra work." [138]
[138] *Brennan v. Prince William Hosp. Corp.,* *supra* note 105, 503 F.2d at 286, citing *Shultz v. Wheaton Glass Co., supra* note 100.
[Footnotes omitted except 138.]

which allegedly constituted a bona fide job classification system. In so doing the Board stresses certain parts of those job descriptions.[33]

33. In their entirety, defendant's job descriptions and specifications read as follows:

### JOB DESCRIPTION

JOB TITLE: CUSTODIAN I                                      JOB CODE: 103

#### FUNCTION

To maintain general sanitary conditions about the plant, to make simple repairs and to perform other related duties as directed.

#### DUTIES

Select appropriate equipment and supplies; sweep and clean floors in shops, classrooms, offices or corridors. Use brooms, brushes, mops, power operated scrubbing machines, vacuum cleaners, buffers, floor scrapers, liquid and paste waxes, dust absorber and other custodial supplies. Collect and dispose of trash, scrap, ashes and garbage. Unload supplies, deliver to proper storage area and position on shelves or storage racks. Move furniture, office and shop equipment and other items which might necessitate the lifting of heavy or bulky articles.

Maintain lavatories in clean and sanitary condition. Sweep, mop and scrub floors, walls and partitions, clean and deodorize wash basins and other lavatory facilities. Refill towel, tissue, soap containers, etc.

Wash and clean windows, light fixtures, ventilators and other items which may necessitate climbing in excess of fifteen (15) feet.

Clean and polish desks, chairs, tables, cabinets and other office or classroom equipment. Clean shop areas, removing grease and oil from equipment, following preventive maintenance procedures and disposing of waste and scraps.

Make simple repairs which are consistent with his individual talents.

May assist cafeteria personnel by cleaning, mopping, and waxing cafeteria floors, by cleaning chairs and tables or by lifting cartons or sacks of food or cafeteria supplies.

Participate in snow removal program by shoveling snow, spreading ashes or chemicals, sweeping or as otherwise directed.

Perform other necessary duties as required.

### JOB SPECIFICATIONS

JOB TITLE: CUSTODIAN I

SALARY GRADE    4
TOTAL POINTS    204
JOB CODE        103

| FACTOR | SPECIFICATIONS | LEVEL | POINTS |
|---|---|---|---|
| EDUCATION | Requires the ability to follow simple oral or written instructions. | 5 | 14 |
| EXPERIENCE | Prior work experience not required. | 5 | 22 |
| INITIATIVE AND INGENUITY | Work is of a repetitive nature but requires limited judgment when effecting simple repairs or deviating from schedule due to emergency. | 4 | 28 |
| PHYSICAL DEMAND | Requires frequent intervals of considerable physical effort to lift and empty containers of trash, move furniture and unload and store supplies. | 2 | 40 |
| MENTAL OR VISUAL DEMAND | Requires normal mental and visual attention to operate power equipment. | 4 | 10 |
| RESPONSIBILITY FOR EQUIPMENT AND MATERIAL | Required to assist in the operations and maintenance of boiler plant and auxiliary equipment where careless practice could result in damage in excess of two hundred and fifty dollars ($250.00). | 3 | 30 |

## JOB SPECIFICATIONS

JOB TITLE: CUSTODIAN I

SALARY GRADE 4
TOTAL POINTS 204
JOB CODE 103

| FACTOR | SPECIFICATIONS | LEVEL | POINTS |
|---|---|---|---|
| RESPONSIBILITY FOR SAFETY OF OTHERS | Requires reasonable care while operating power equipment to prevent minor injury to others. | 4 | 10 |
| RESPONSIBILITY FOR WORK OF OTHERS | Responsible for assigned work only. | 5 | 5 |
| WORKING CONDITIONS | Somewhat disagreeable working conditions when exposed to garbage fumes or when required to clean shop areas where equipment and surroundings might be greasy or dirty. | 3 | 30 |
| UNAVOIDABLE HAZARDS | Failure to exercise due care while climbing or moving heavy items could result in serious injury. | 3 | 15 |

## JOB DESCRIPTION

JOB TITLE: CUSTODIAN II                                    JOB CODE: 102

### FUNCTION

To perform routine cleaning assignments which contribute to the over-all sanitary conditions of school facilities.

### DUTIES

Sweep and clean floors in classrooms, offices and corridors, using brooms, brushes, mops, vacuum cleaners and similar cleaning aides. Empty and clean wastebaskets and ashtrays.

Maintain lavatories in clean and sanitary condition. Sweep, mop and scrub floors, walls and partitions. Clean and deodorize wash basins and other lavatory facilities. Refill towel, tissue, soap containers, etc.

Clean windows which are accessible without necessity to utilize ladders in excess of three feet. Clean and polish desks and other office equipment. Clean and polish brass, bronze and other metal ornaments, knobs, handles, etc.

May be required to perform laundry work such as the operation of washers, extractors and dryers. Adjust equipment to proper cycles, add detergents, bleach or other agents per instructions and wash items such as towels and washable athletic attire.

Serve as security guard. Maintain constant vigilance to alleviate loss due to fire, theft, vandalism and illegal entry. Examine doors, windows and gates to determine if they are secure. Watch for and report irregularities.

Perform other necessary duties as required.

### JOB SPECIFICATIONS

JOB TITLE: CUSTODIAN II

SALARY GRADE 3
TOTAL POINTS 130
JOB CODE 102

| FACTOR | SPECIFICATIONS | LEVEL | POINTS |
|---|---|---|---|
| EDUCATION | Requires the ability to follow simple oral or written instructions. | 5 | 14 |
| EXPERIENCE | Prior work experience not required. | 5 | 22 |
| INITIATIVE AND INGENUITY | Requires the ability to understand and follow simple instructions in performing simple cleaning operations, etc., requiring little or no judgment since employee is told exactly what to do. | 5 | 14 |

The nearly all male Custodian I category is described in the job descriptions as follows:

## CUSTODIAN I

Sweep and clean floors . . . collect and dispose of trash, scrap, ashes and garbage . . . maintain lavatories in clean and sanitary condition, clean and polish desks, chairs, etc. Select appropriate equipment and supplies.

Wash and clean windows, light fixtures, ventilators, and other items which may necessitate climbing in excess of 15 feet.

Use . . . power operated scrubbing machines, vacuum cleaners, buffers, floor scrapers, liquid and paste waxes . . .

Make simple repairs . . .

Unload supplies, deliver to proper storage area, and position on shelves or storage racks. Move furniture, office, and shop equipment and other items which might necessitate the lifting of heavy or bulky articles . . . lifting cartons or sacks of food or cafeteria supplies.

## EDUCATION

. . . ability to follow simple oral or written instructions.

## INITIATIVE AND INGENUITY

. . . requires limited judgment when effecting simple repairs or deviating from schedule . . .

## PHYSICAL DEMAND

. . . frequent intervals of considerable physical effort to lift and empty containers of trash, move furniture and unload and store supplies.

## MENTAL OR VISUAL DEMAND

Requires normal mental and visual attention to operate power equipment.

The largely female Custodian II classification is described:

## CUSTODIAN II

Sweep and clean floors in classrooms, offices and corridors, using brooms, brushes, mops, vacuum cleaners, and similar cleaning aides.

JOB SPECIFICATIONS

JOB TITLE: CUSTODIAN II

SALARY GRADE 3
TOTAL POINTS 130
JOB CODE 102

| FACTOR | SPECIFICATIONS | LEVEL | POINTS |
|---|---|---|---|
| PHYSICAL DEMAND | Requires moderate but sustained physical effort while dusting, polishing and cleaning. | 3 | 30 |
| MENTAL OR VISUAL DEMAND | Requires normal visual but little or no close concentration or hand-eye coordination. | 5 | 5 |
| RESPONSIBILITY FOR EQUIPMENT AND MATERIAL | May cause loss of cleaning supplies utilized in daily tasks due to improper storing, dropping, spilling or theft, however, loss would be negligible. | 5 | 10 |
| RESPONSIBILITY FOR SAFETY OF OTHERS | Little or no opportunity to cause injury to others. | 5 | 5 |
| RESPONSIBILITY FOR WORK OF OTHERS | Responsible for assigned work only. | 5 | 5 |
| WORKING CONDITIONS | Requires somewhat disagreeable working conditions such as the thorough cleaning of lavatories and lavatory facilities. | 4 | 20 |
| UNAVOIDABLE HAZARDS | Work is non-hazardous and there is little or no opportunity for job related injury. | 5 | 5 |

Empty wastebaskets and ashtrays.

Clean windows which are accessible without necessity to utilize ladders in excess of three feet. Clean and polish desks and other office equipment. Clean & polish brass, bronze, & other metal ornaments, knobs, handles, etc.

Maintain lavatories in clean and sanitary condition.

Sweep, mop and scrub floors, walls, and partitions. Clean and deodorize wash basins and other lavatory facilities.

Refill towel, tissue, soap containers, etc.

### EDUCATION

Requires the ability to follow simple oral or written instructions.

### EXPERIENCE

Prior work experience not required.

### INITIATIVE AND INGENUITY

Requires the ability to understand and follow simple instructions in performing simple cleaning operations, etc., requiring little or no judgment since employee is told exactly what to do.

### PHYSICAL DEMAND

Requires moderate but sustained physical effort while dusting, polishing, and cleaning.

### WORKING CONDITIONS

. . . somewhat disagreeable working conditions such as the thorough cleaning of lavatories . . .

### UNAVOIDABLE HAZARDS

Work is non-hazardous . . . little or no opportunity for job related injury.

Examination of the job descriptions discloses that Custodians I and II perform essentially the same cleaning functions.

They both sweep and clean floors, dispose of trash, clean desks and furniture and maintain lavatories in a clean and sanitary condition. However, the job description assigns the following extra tasks as part of the Custodian I's duties:

(1) use of power-operated floor cleaning machines;

(2) disposal of all trash collected by Custodians I and II;

(3) unloading and distribution of supplies;

(4) movement of heavy articles;

(5) snow removal;

(6) simple repairs;

(7) use of ladders; and

(8) boiler maintenance.

According to the Board's answer to plaintiff's interrogatories, the operation of boilers involves a greater degree of skill and responsibility than any jobs which the Custodian II perform, while all the other enumerated extra tasks the Custodians I perform involve greater effort.

Mr. Herbert Mitchell, a job analyst for the Board, testified that he formulated the different custodial classifications in 1964 and that in so doing he gathered information for the job descriptions from a dictionary of occupational titles published by the federal government, from discussions with representatives of local industries and various governmental agencies, and from personal contacts with employees. Mitchell related that he used ten rating factors, including education, experience, ingenuity and initiative, mental and visual attention, and physical exertion—and applied them to the job in question.[34] Each category was then sub-divided into five levels, with a certain point value attached to each. The sum total of all the points was converted into the appropriate pay grade.[35] Mitchell

---

**34.** *See* note 33 *supra.*

**35.** At trial, Mitchell was asked how complete the job descriptions were intended to be. He answered:

No job description can be totally descriptive. We hoped that the job description would identify the general scope and complexity of the job, and we tried to enumerate those jobs which are most frequently performed to identify where the job would be and the scope of things, but it is impossible to list everything because there is always something that will come up that you have not written down.

further testified that sex was not a factor. In order for a worker to be rated in the higher custodial category, Mitchell testified, he would have to perform 50 per cent of the enumerated extra duties about 75–80 per cent of his work time.

At trial, the Board also introduced the testimony of Donald E. Hoag, Chief of Trades and Labor Occupation Section of the United States Civil Service Commission. Hoag offered the Civil Service's rating system for custodial workers in comparison with the system used by defendant. Generally, the Civil Service Commission rates jobs in the same manner as the Board, assigning varying point values for different criteria applied to each job. For example, dry mopping would receive a lower rating than machine scrubbing. Hoag emphasized that, in order for any task to affect a job grading, it would generally have to be performed on a regular and recurring basis, probably on every shift the employee works. In addition, no single factor would change the rating of a job unless that factor was very significant.

In *Corning Glass Works v. Brennan*, 417 U.S. 188, 94 S.Ct. 2273, 41 L.Ed.2d 1 (1974),[36] the only Supreme Court decision construing the Equal Pay Act, the Court examined the legislative history of the Act. Mr. Justice Marshall, writing for five members of the Court, noted that Congress intended that wage differentials based upon

"bona fide job evaluation plans would be outside the purview of the Act" (*id.* at 201, 94 S.Ct. at 2231); that the legislative history revealed that the criteria of the Act were patterned on job classification systems used in industry; that such systems generally take into account the four factors of skill, effort, responsibility, and working conditions and apply them to each job; and that each component is then divided into subcomponents resulting in a total point value (*id.* at 199–200, 94 S.Ct. 2223).

■ Only *bona fide* job classification systems will survive scrutiny under the Equal Pay Act. In *Shultz v. Wheaton Glass Co.,* 421 F.2d 259, 265 (3d Cir.), *cert. denied,* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), Judge Freedman wrote:

Differences in job classifications were in general expected to be beyond the coverage of the Equal Pay Act. This was because in the case of genuine job classifications the differences in work necessarily would be substantial and the differences in compensation therefore would be based on the differences in work which justified them. Congress never intended, however, that an artificially created job classification which did not substantially differ from the genuine one could provide an escape for an employer from the operation of the Equal Pay Act. \* \* \* [Footnote omitted.][37]

**36.** In *Corning Glass Works*, the higher paid night shift at Corning's plants was worked at one time exclusively by males who did the same work as the female employees who worked the day shift. Corning argued that the wage differentials were based on the fact that the men worked the night shift and different working conditions were involved. Mr. Justice Marshall noted that in most industry job evaluation plans, including Corning's, the term "working conditions" does not encompass shift differentials. The Justice therefore concluded that shift differentials in the inspection jobs involved in that case did *not* render the two shifts of work unequal for purposes of the Equal Pay Act. He commented that the shift differential originated at a time when male employees would not work at the same rate as women inspectors and "reflected a job market in which Corning could pay women less than men for the same work." Mr. Justice Marshall held that Corning had not carried its burden of

establishing that the shift differential was based upon a " 'factor other than sex.' " *Id.* at 204–05, 94 S.Ct. at 2233.

**37.** *See also Katz v. Clayton School District,* 557 F.2d 153, 156 (8th Cir. 1977) in which, disagreeing with the District Court, Judge Heaney interpreted the word "requires" in the Equal Pay Act, *see* p. 30, *supra,* to mean "that two employees [teachers] are doing equal work for an employer only where the employer has formally specified that the two employees are to perform the same duties"; and held that the "Act cannot be avoided because the job titles of employees are not the same nor is the Act avoided if the official job descriptions of employees specify different duties." Judge Heaney then quoted as follows from the Fourth Circuit's opinion in *Brennan v. Prince William Hosp. Corp.,* 503 F.2d 282, 288 (4th Cir. 1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1392, 43

In other words, job requirements and performances, in actual fact, are controlling, not the mere words of job discriptions.[38] The issue in this case therefore is whether, despite the Board's job rating plan, the work of the two categories of custodians, *as actually performed*, was substantially equal.

### B. Job Performance

The parties adduced the testimony of fifty custodial witnesses, thirty-nine by deposition *de bene esse* and eleven at trial, and also the trial testimony of Heinz Kinzel, an assistant supervisor for the Board, concerning the work actually performed by custodians.[39]

### 1. Custodians II

Despite their division into several shifts,[40] Custodians II were usually assigned to clean classrooms, bathrooms, office and faculty areas. However, some female Custodians II were assigned to clean the gym and health areas [41] or to help clean the cafeteria.[42] The Custodian II's customary equipment consisted of a a fibreboard barrel on wheels, a scrub bucket on wheels with an attached wringer, a wet mop of either 16 oz. or 24 oz. size, a dust mop either 16 or 24 inches in width, a small pail of water, rags, sponges and cleaning solutions. Custodians II assigned to clean bathrooms carried packages of hand towels and toilet paper.

In the course of cleaning their assigned areas, Custodians II dust mopped or spot mopped floors and hallways and vacuumed carpeted areas. Sweeping classrooms involved moving furniture or putting chairs

L.Ed.2d 652 (1975): " 'Actual job requirements and performance are controlling.' "

**38.** 29 C.F.R. § 800.121 provides:

§ 800.121 Job content controlling.

Application of the equal pay standard is not dependent on job classifications or titles but depends rather on actual job requirements and performance. For example, the fact that jobs performed by male and female employees may have the same total point value under an evaluation system in use by the employer does not in itself mean that the jobs concerned are equal according to the terms of the statute. Conversely, although the point values allocated to jobs may add up to unequal totals, it does not necessarily follow that the work being performed in such jobs is unequal when the statutory tests of the equal pay standard are applied. Job titles are frequently of such a general nature as to provide very little guidance in determining the application of the equal pay standard. For example, the job title "clerk" may be applied to employees who perform a variety of duties so dissimilar as to place many of them beyond the scope of comparison under the statute. Similarly, jobs included under the title "stock clerk" may include an employee of one sex who spends all or most of his working hours in shifting and moving goods in the establishment whereas another employee, of the opposite sex, may also be described as a "stock clerk" but be engaged entirely in checking inventory. Clearly, the equal pay standard would not apply where jobs require such substantially different duties, even though the job titles are identical. In other situations, including those which exist in the case of jobs identified by the general title "retail clerks", the facts may show that equal skill, effort, and responsibility are required in the jobs of male and female employees notwithstanding they are engaged in selling different kinds of merchandise. In all such situations, the application of the equal pay standard will have to be determined by applying the terms of the statute to the full factual situation.

**39.** Compare the use of depositions in this case with the procedure followed by Judge Lacey in *Brennan v. Board of Education,* 374 F.Supp. 817, 819–20 (D.N.J.1974). Herein, both sides desired that this Court hear and observe certain witnesses in order to have the benefit of demeanor-type evidence.

**40.** Defendants operated three basic shifts: 7:30 a. m. to 4:00 p. m., 3:30 p. m. to 12:00 midnight, and 11:30 p. m. to 8:00 a. m. In addition, many of Baltimore County's schools have a "cafeteria shift" which normally begins at 10:30 a. m. and ends at 7:00 p. m. The main difference between the work on the several shifts was that most of the machine scrubbing and light bulb changing was done on the two later shifts.

**41.** Helen Guy deposition at 5–6. Betty Gregg deposition at 10, 11, 12, 39. References to testimony in depositions *de bene esse* will be cited as "[name] depos. at [page numbers]."

**42.** Beatrice Meekins trial transcript at 196. Olivia Gibson trial transcript at 388. References to testimony in trial transcript will be cited as "[name] Tr.T. at [page numbers]."

on top of desks in order to clean under them. After cleaning, the furniture had to be realigned. In the library, chairs weighing approximately 10 lbs. each had to be placed on the tables.[43] In the music rooms pianos and band instruments had to be pushed aside or moved.[44]

The teachers' desks, bookshelves, countertops and window ledges were dusted with a dust cloth, and chalk board ledges were wiped with a damp rag. Windows in classroom doors were cleaned with an ammonia solution, and in classrooms so equipped, sinks were scoured with a cleanser and a sponge. In the art rooms, paint and clay were cleaned or scraped from the sinks and floors.[45]

In carpeted areas and in newer "open space" schools the general routine was the same except that floors were vacuumed instead of dust mopped, with either a small 20 lb. vacuum cleaner[46] or a large commercial model weighing approximately 75 lbs.[47]

The Custodian II would pull her wheeled fibreboard barrel behind her along her route and dump into it trash collected from classrooms, offices, and bathrooms. When full, those barrels were rolled to an exit door so that a Custodian I could empty them into a dumpster. However, many Custodians II regularly dumped their own trash.[48]

In the office area of each school, which consisted of the principal's and other administrative offices, guidance offices, the health suite and faculty lounges, Custodians II dusted or wiped furniture and fixtures with a damp rag, emptied ashtrays and wastebaskets, and dust mopped or vacuumed floors, as required. In the bathrooms, toilets and urinals were cleaned and disinfected, sinks scoured, mirrors cleaned, walls spotted, floors wet mopped and paper supplies replenished.

Custodians II were supposed to have no duties with regard to boiler operations, snow shoveling or handling cafeteria food supplies or satellite food containers. However, some Custodians II did perform those duties.[49] Although Custodians II were not supposed to replace burned out lights, several did so at various times.[50] Also, although they were not supposed to climb ladders, many Custodians II did so, either to change light bulbs or to perform other duties such as washing walls or venetian blinds.[51] A few Custodians II used the power scrubbing machines[52] and helped to

43. Mary Beale depos. at 6, 7; Mamie Ingram depos. at 10, 11; Vivian Burrell depos. at 6; Otis Virginia Lewis depos. at 12.

44. Kathleen France depos. at 7; Dolores Pearson depos. at 14.

45. Pearson depos. at 9; Goldie Owens depos. at 13.

46. Beale depos. at 11.

47. Ingram depos. at 15, 16, 49; Ethel Green depos. at 16.

48. Beale depos. at 14 (3 times per week); Guy depos. at 13 (once a week); Margaret Sivels depos. at 10 (2–3 times per week); Elizabeth Nelson depos. at 9 (2 barrels per night); Katherine Taylor depos. at 12 (once a night); Cora Jones depos. at 19, 45, 46 (4 barrels per night); Gregg depos. at 13, 14, 42, 54 (3 times per week); Annie Smith depos. at 85, 87 (4 times per day); Peggy Dunnock depos. at 9, 10 (several times per week).

49. Meekins Tr.T. at 196 (carried food trays 5–6 times each month); Meekins Tr.T. at 211 (shoveled snow); Gibson depos. at 348 (carried food trays every day for two weeks); Shirley Jordan Tr.T. at 466 (placed milk carriers in cooler).

50. Nelson depos. at 11; Taylor depos. at 14; Gregg depos. at 49, 50 (changed lights in locker room once a week); Gibson Tr.T. at 356 (twice a week); Meekins Tr.T. at 308–09.

51. Queen Esther Gough depos. at 14; Taylor depos. at 14.

52. Sivels depos. at 15, 25; Burrell depos. at 26, 56, 57; Lewis depos. at 13, 14, 43, 46; Gibson Tr.T. at 348; Meekins Tr.T. at 230.

distribute school or cleaning supplies.[53] Custodians II were not supposed to work alone in a building although many did so at some time.[54] In addition, several of the Custodians II, on occasion, went outside of the school building to make certain that doors and windows were locked.[55] According to supervisor Kinzel, female Custodians II never worked on weekends and were generally not left working alone in school buildings. Some Custodians II also performed simple repairs, such as unstopping sinks and toilets, and fixing broken furniture glides.[56]

### Custodians I

Custodians I, although employed over three different shifts,[57] were also engaged primarily in cleaning duties. They were responsible for cleaning classrooms, libraries, bathrooms, gyms, and hallways.[58] While performing those tasks, they performed the same cleaning functions as the Custodians II.[59] Floors and hallways were dust mopped or spot mopped and carpeted areas were vacuumed. Furniture in classrooms was moved so that the floors could be swept or dry mopped. The teachers' desks, bookshelves, countertops and window ledges were dusted, and chalk board ledges were wiped.

Bathroom floors were wet mopped, usually with a 24 oz. mop (most Custodians II use a 16 oz. wet mop).

Toilets and urinals were cleaned and disinfected, sinks scoured, mirrors cleaned, walls spotted and paper supplies replenished. Custodians I use the same size scrub bucket and wringer as the Custodians II. In the office areas, furniture and fixtures were dusted or wiped with a damp cloth. Ashtrays and trash cans were emptied, and floors either dust mopped or vacuumed.

According to the Board, the higher wage received by the Custodians I was based on the "operational" type work they did in addition to general cleaning duties. In practice, the performance of those addition-

---

53. Gregg depos. at 26 (occasionally unloaded trucks and lifted cartons); Meekins Tr.T. at 202, 204; Gibson Tr.T. at 349–50.

54. Beale depos. at 42; Porter depos. at 42–43; Gregg depos. at 33; Burrell depos. at 22, 53, 54; Lewis depos. at 27, 28; Caroline France depos. at 35, 36, 37; Meekins Tr.T. at 233.

55. Guy depos. at 16; Dunnock depos. at 13; Taylor depos. at 12; Jones depos. at 22; Burrell depos. at 55; Meekins Tr.T. at 226.

56. Nelson depos. at 18, 19 (plunged toilets, repaired desks); Porter depos. at 31 (plunged toilets); McClinton depos. at 31 (plunged toilets); Gregg depos. at 22 (plunged toilets and fixed chair glides); Smith depos. at 23 (plunged toilets and fixed loose screws on doors); Lewis depos. at 14, 15; Dunnock depos. at 6; James depos. at 73 (repaired furniture glides).

57. *See* n. 20, *supra.*

58. Marion Johnson, Tr.T. at 538–39; Earl Leitz Tr.T. at 140–41; Nelson Reed Tr.T. at 65; Aubrey Johnson depos. at 190; Ernest Cline depos. at 250–51; George Ayers depos. at 7, 37, 38; Wm. McCray depos. at 8, 9; Gilbert Barr depos. at 62; Theodore Pitts depos. at 7; Wilmore Norris depos. at 7.

59. *See generally* George Hess depos. The "ca eteria man" was the only Custodian I whose work was not substantially of a cleaning nature. The only witness who worked as a "cafeteria man" was George Hess, and he did not work in that capacity during the 1974–76 period in question. However, his testimony is relevant and material with regard to ascertaining what that job actually entailed. In addition, one other witness sometimes substituted for the "cafeteria man." Hess testified that he carried three 65 lb. cases of milk to the cooler, a distance of approximately 40 feet. He also carried three more cases to the serving area, and eight or nine food carriers outside to a car. The carriers weigh 30–40 lbs. empty and 60–75 lbs. when full. Several times a month he unloaded cartons of frozen food, produce, canned goods and paper products and delivered them to the appropriate places. Hess also emptied eleven barrels full of trash daily, swept the cafeteria floor between lunch shifts, and steamed the trash cans after all lunch periods. The cafeteria floor was mopped by him daily. After he mopped the cafeteria, Hess swept a stairwell, hallway, auditorium and six restrooms. He was then available to do any other jobs that came up. For example, once every few weeks he received mimeograph supplies and stacked them in the boiler room. Sometimes Hess delivered 55 gallon drums of wax or soap; he also changed some light bulbs every day.

al tasks varied extensively among the custodians. For example, Custodians I were supposed to dump all trash, including that collected by the Custodians II, into the dumpster. Most Custodians I du.nped three or four barrels weighing 20–50 lbs. each every night.[60] However, Custodians I who worked as "cafeteria men" dumped more than ten barrels daily [61] while several Custodians I dumped only one barrel.[62] One custodian stated that he never dumped trash into the dumpster, but usually left it for the next shift.[63]

Custodians I were also responsible for all floor care that involved the power scrubber and water pick-up machines. Machine scrubbing involved putting down soapy water with a bucket and mop, operating the 115 lb. scrubber, picking up the water with the pick-up machine rinsing the floor with a bucket of water and a mop, and applying and buffing two coats of wax. Except during summers, when floor care was a major portion of the Custodian I's duties, machine floor scrubbing involved only several days of work each year.[64] Other than in the summer, the greatest frequency that any witness used the power scrubber was every weekend.[65] Several Custodians I never used the floor care machines other than in the summer.[66]

Custodians I were also supposed to change all burned out light bulbs. Except for the lights in the gym,[67] that task involved the use of a 6–8 foot ladder. Light bulbs were changed with varying frequencies, most men doing it several times per week.[68] It was estimated by one witness that light bulb changing took at most a half hour per day.[69]

Although Custodians I were supposed to be responsible for making simple repairs, several Custodians I said that they never did so.[70] The repairs that were made by them usually involved such things as plunging toilets and unstopping sinks.[71] Some custodians also changed mop heads [72] or took down doors to repair locks.[73]

Custodians I were also purportedly responsible for building security and for boiler safety. Generally, the Custodians I who worked the second or third shift would walk around the outside of the school building once or twice a night to make certain that doors and windows were secure.[74] However, some custodians checked only from the inside to see that doors were locked.[75] According to supervisor Kinzel, only Custodians I would be assigned to work alone in a building or to work on weekends. All Cus-

60. Johnson, M. Tr.T. at 540, 550; Leitz Tr.T. at 174; Nelson Reed Tr.T. at 73; Bill Widerman Tr.T. at 23; Cline depos. at 257; McCray depos. at 30; Barr depos. at 79–81.

61. Hess depos. at 113–14.

62. Johnson, A. depos. at 226, 227; Ayers depos. at 10.

63. Benjamin Abraham depos. at 12.

64. Johnson A., Tr.T. at 231, 237, 238; Cline depos. at 281; Ayers depos. at 9, 39, 57; Abraham depos. at 14, 15, 16; Norris depos. at 15, 16; Charles Harrison depos. at 79; Leitz Tr.T. at 154, 155; Widerman Tr.T. at 25; Reed Tr.T. at 67.

65. McCray depos. at 12; Hess depos. at 137; Pitts depos. at 19.

66. Barr depos. at 61, 62; Johnson, M. Tr.T. at 544; Hargrove Tr.T. at 1038.

67. Hargrove Tr.T. at 1033 (used 40 ft. ladder).

68. Ayers depos. at 11, 12; McCray depos. at 14; Abraham depos. at 13; Johnson, M. Tr.T. at 542; Leitz Tr.T. at 151, 165.

69. Widerman Tr.T. at 30.

70. Reed Tr.T. at 721; Cline depos. at 256; Ayers depos. at 13; Abraham depos. at 13; Hess depos. at 135; Norris depos. at 12.

71. Hargrove depos. at 1032; Johnson, M. Tr.T. at 555; Pitts depos. at 30; Harrison depos. at 71.

72. Johnson, A. depos. at 199.

73. Hargrove depos. at 1033.

74. Widerman Tr.T. at 53; Hargrove depos. at 1031; Ayers depos. at 65; McCray depos. at 44; Pitts depos. at 69; Norris depos. at 19; Harrison depos. at 83.

75. Johnson, M. Tr.T. at 541; Johnson, A. depos. at 234; Abraham depos. at 20; Barr depos. at 88.

todians I were trained in boiler operation and safety, and most had some responsibilities with regard to the boilers.[76] However, the extent of their daily responsibilities apparently was periodically to check the boiler to see if it was operating and to press a reset button if it was not.[77] Boiler maintenance mainly involved punching tubes. All men who did the job emphasized that it was extremely dirty and unpleasant, and took a great deal of strength.[78] However, all the witnesses testified that tube punching was only done by each man once a year for four hours, except for one witness, a Custodian I,[79] who stated that he punched tubes once a week.[80]

Custodians I were available to accept deliveries and to shovel snow. However, those duties were performed very infrequently. Many men never unloaded trucks,[81] while a few did so once or twice per year.[82] The only witness who regularly unloaded supplies was George Hess, but that was part of his regular duties as "cafeteria man." [82A] Most Custodians I had never shoveled snow,[83] that being the general responsibility of the grounds crew. However, there is evidence that several men, once or twice, shoveled snow around entrance ways.[84]

## C. Analysis

The record discloses that the male Custodians I spent most of their work time performing the same general cleaning functions as the female Custodians II. Since the core tasks of the two jobs were identical, the work was equal within the meaning of the Equal Pay Act unless the extra duties performed by Custodians I (1) involved more skill, effort, and responsibility than the general cleaning functions, (2) were performed for a significant portion of the workday, and (3) were done by all or nearly all of the higher paid workers.[85]

The two Fourth Circuit decisions which construe the Equal Pay Act are instructive. In *Hodgson v. Fairmont Supply Company,* 454 F.2d 490 (4th Cir. 1972), one male employee and three female employees performed the same "core" duties as inventory clerks. However, the male employee supposedly did sixteen extra duties which justified his higher salary. Judge Craven wrote that those duties did not justify his higher salary, either because they were infrequently performed (attended monthly sales meetings), were illusory (supposedly had the authority to confirm telephone orders, but never did so), or required the same skills and effort jobs performed by the female inventory clerks.

*Brennan v. Prince William Hospital Corporation,* 503 F.2d 282 (4th Cir. 1974), posed the issue of whether or not female nurses' aides performed substantially the same functions as male orderlies. The basic routines of both jobs were the same. The

76. Johnson, M. Tr.T. at 540, 554, 555 (had no boiler duties).

77. Leitz Tr.T. at 152, 178; Widerman Tr.T. at 27; Cline depos. at 256, 257; Ayers depos. at 25, 26, 28; McCray depos. at 16; Pitts depos. at 30, 31; Norris depos. at 12, 38.

78. Widerman Tr.T. at 27; Ayers depos. at 22, 23; Abraham depos. at 6, 14, 51; Barr depos. at 100, 101; Harrison depos. at 71.

79. Heinz Kinzel, an assistant supervisor of custodians, testified that coal-fired boilers in four schools and oil-fired boilers in certain schools required weekly cleaning. However, in most schools, "tube-punching" in the boilers was done on an annual basis.

80. Johnson, A. depos. at 205.

81. Leitz, A. Tr.T. at 167; Widerman Tr.T. at 26; Johnson depos. at 199, 200; Cline depos. at

277, 278; Ayers depos. at 14, 59, 73; Abraham depos. at 6, 14, 51; Pitts depos. at 33.

82. Barr depos. at 95; Hargrove Tr.T. at 1032; Hess depos. at 104–06, 109–19.

82A. *See* n. 59, *supra.*

83. Johnson, A. depos. at 202; Cline depos. at 256, 257; Ayers depos. at 14, 60; Abraham depos. at 4, 6, 51; Johnson, M. Tr.T. at 554; Widerman Tr.T. at 26.

84. McCray depos. at 18; Pitts depos. at 33; Norris depos. at 14; Harrison depos. at 78; Leitz Tr.T. at 152; Reed Tr.T. at 73; Hargrove depos. at 1031.

85. *See* pp. 31–32, *supra*

males also did heavy lifting, assisted in the emergency room, restrained hysterical patients and performed catheterizations on male patients. However, the female aids did heavy lifting when no orderly was available. Judge Butzner, after stressing (at 285–86) that "the semblance of the valid job classification system may not be allowed to mask the existence of wage discrimination based on sex," concluded that the extra effort exerted by the males in heavy lifting and in certain other respects was not substantial enough to justify the higher wage. The same was true of the other differentiating factors relied on by the hospital. The aids performed the same emergency room functions as orderlies with minor variations, and prepared female patients for surgery in the same manner as orderlies prepared males. As to the security and restraint duties of males, the performance of those duties was seldom required. While only the orderlies catheterized the male patients, the hospital "concedes" that " 'any reasonably dexterous person can learn' " to perform that procedure (at 290), and also commented that new male orderlies who have not yet learned to perform catheterizations still received the higher wage.

There are seemingly no Supreme Court or Fourth Circuit opinions in which custodial job classifications have been assessed in the light of the equal pay act. Other courts have, however, dealt with school custodians on facts quite similar to those of this case. In *Brennan v. Jersey City Board of Education,* 374 F.Supp. 817, 822 (D.N.J.1974), the defendant asserted that the higher wage paid to male custodians was justified by the extra tasks performed by those employees:

The Board claims that men perform additional duties not performed by women, including cleaning stairwells and corridors, sweeping and picking up papers outdoors, cutting grass and shrubs, shoveling snow, operating buffing machines, receiving deliveries, moving furniture, carrying five gallon water cooler jugs, screwing in lightbulbs, climbing ladders, and acting as watchmen. The Board claims that these extra duties are valid factors "other

than sex" which justify the pay differential under 29 U.S.C. § 206(d)(1)(IV). * * * After reviewing the trial testimony in some detail, Judge Lacey summarized his findings (at 827):

The work of some of the males is almost identical with that of females. As to other males, the only measurable differences lie in their doing certain outside work and using buffing and scrubbing equipment. The outside work, not performed by all males, does not occupy substantial amount of time. It involves only a few hours of snow removal, and a few hours of grass cutting and hedge cutting and weeding during the entire year. It is thus only incidental and occasional. The use of buffing and scrubbing machines by certain, but not all, men occurs generally during the summer months. As has already been stated, the men who perform these "different" tasks are not paid at a higher rate than the men who do not.

Judge Lacey concluded that the extra duties were not significant enough to support the wage differential and (at 829) that the effort was substantially equal, even though the jobs themselves may sometimes have been different:

The male and female jobs here are also equal with regard to the factor of effort. Virtually all the custodial employees perform routine cleaning, wet and dry mopping, sweeping, scouring, polishing, dusting, washing, waxing and handling of trash. Some of the custodial workers perform one or more additional duties, but while these men are working at allegedly "male" tasks, the women are continuing with the regular routine, or themselves performing comparable odd jobs. For example, the effort involved in the moving of deliveries, or in extremely limited and infrequent snow shoveling, is balanced by the pushing of wet mops and brooms, scouring of bathrooms, shoving of furniture and the moving or carrying of garbage or personal supplies, regularly done by the females. Similarly, the physical input of the males on the buffing machine is certainly no greater than the

physical effort required for the comparable female summer job of washing down furniture. Consistent with the *Wheaton [Shultz v. Wheaton Glass Co., supra]* standard of "substantial equality," it is clear that "jobs may require equal effort in their performance even though the effort may be exerted in different ways on the two jobs." Here the "differences only in . . . kind of effort" did not justify the wage differential. 29 C.F.R. 800.127. The only male job which required any extra skill, Judge Lacey noted, was the making of simple repairs, but he also noted (at 829) that those repairs were performed so infrequently that " 'possession of a skill not needed to meet requirements of the job cannot be considered in making a determination regarding equality of skill.' 29 C.F.R. 800.125." In sum, Judge Lacey held that the work of the so-called "heavy [male] and light [female] cleaners" was substantially equal, that therefore the wage differential was based on sex, and that, accordingly, those differentials violated the Equal Pay Act.

*Brennan v. Houston Endowment, Inc.,* 7 E.P.D. ¶ 9204 (S.D.Tex.1974), *aff'd per curiam,* 511 F.2d 1190 (5th Cir. 1975), is to the same effect. In that case, the Court found that female office building service employees who were assigned to such office cleaning jobs as dusting, cleaning, removing trash, vaccuming, tile scrubbing, spot cleaning of walls and carpets, cleaning blinds and restroom cleaning, performed work requiring skill, effort and responsibility substantially equal to that done by higher paid male employees who used wet mops, stepladders and power equipment such as buffers, wet vacuums and carpet pile lifters. The Court held that the defendant could not justify the wage differential on the basis of the women's lack of familiarity with the the power equipment. It found that the skill involved in operating the power equipment was no greater than the skill required of the women in vacuuming and cleaning venetian blinds. Likewise, the Court found that the effort expended to operate the power tools did not exceed that exerted by the woman in their duties. In *Houston Endowment,* unlike this case, there was no evidence that the defendant had made any effort to compare the jobs of the male and female workers in terms of the skill, effort, and responsibility required.

In *Hodgson v. San Diego Unified School District,* 6 E.P.D. ¶ 8684, p. 5070 (S.D.Cal. 1972) male school "custodians" performed the following duties which were not required of female "matron custodians."

(1) Operate and maintain heavy, commercial electric scrubbing and polishing machines.

(2) Empty large, heavy, trash cans containing heavy trash and shop debris.

(3) Move heavy furniture.

(4) Climb ladders to clean high walls and windows and to replace lights in ceiling fixtures.

(5) Work on high scaffolding.

(6) Work the evening shift.

(7) Return to school at night or on weekends in response to vandalism reports.

(8) Start, stop, and adjust oil-burning and gas-burning heating plants.

(9) Perform preventive maintenance and minor repairs on equipment.

(10) Climb onto the roofs of buildings.

Judge Ferguson concluded (at 5074) that those extra tasks did not render the jobs unequal. The additional male duties were either performed an insignificant amount of time (*e. g.,* work on high scaffolding (at 5073)), required no greater "appreciable" skill, effort and responsibility than analogous duties done by the matron custodians (*e. g.,* machine floor scrubbing compared to wet mopping (at 5073)), or were also actually performed by the matron custodians (*e. g.,* emptying trash, climbing on roofs (at 5073)). *See also Brennan v. South Davis Community Hosp.,* 538 F.2d 859, 863–64 (10th Cir. 1976) (extra effort male janitors spent running power cleaning machine, filling pop machine, shoveling snow, and carrying large garbage cans was "too insubstantial" to render their work unequal to that of female maids); *Brennan v. Goose Creek Consolidated Indep. School Dist.,* 519 F.2d

53, 58 (5th Cir. 1975) (district court finding that male and female janitors performed equal work was adequately supported by the record); *Marshall v. City of Torrington,* 14 E.P.D. ¶ 7727 (D.Conn.1977) (female custodians stationed primarily in girls' gym performed work substantially equal to male custodians in boys' gym); *Usery v. Dallas Indep. School Dist.,* 14 E.P.D. ¶ 7536 (N.D. Tex.1977) (substantially equal work was done by male and female custodians on facts substantially similar to those of this case); *Hodgson v. Grove City College Corp.,* 3 E.P.D. ¶ 8328, p. 7167, 7169 (W.D.Pa.1971) (Judge Weis, then a District Judge, concluded that male and female custodians performed duties "which differ in no appreciable way" 95% of work time; and that intermittent performance by males of other jobs such as cleaning incinerators and outside window wells did not render work unequal); *Hodgson v. Waynesburg College,* 3 E.P.D. ¶ 8343, p. 7218 (W.D.Pa.1971) (wage differential not justified when 90% of duties of male and female custodians were substantially the same and such extra duties of males as shoveling snow and mowing grass, required only "sporadic" work (at 7221)).

There are two cases, both in the Second Circuit, in which courts have held that work performed by male and female custodians was not equal. In *Usery v. Columbia University,* 568 F.2d 953 (2d Cir. 1977), "heavy" cleaners, nearly all of whom were male, received a higher wage that "light" cleaners, all of whom were female. Light cleaners did basic cleaning of academic buildings and residence halls, dusting, emptying wastebaskets, and vacuuming. Heavy cleaners could be grouped into four categories: (1) some were assigned to public corridors, lobbies, stairways, and elevators; (2) some cleaned public lavatories; (3) some were permanently assigned to special projects such as scrubbing and stripping floors, shampooing rugs, and washing venetian blinds; (4) some cleaned certain off-campus buildings in a high-crime area. Most of the heavy cleaner jobs involved heavy lifting and other duties not performed by the light cleaners.

The district court dismissed the action on the ground that the heavy cleaner jobs involved greater effort. The Second Circuit affirmed in a 2–1 opinion; Judge Oakes dissenting. In so doing Judge Timbers, for the majority, wrote (at 960):

The concept of "effort" in the Act is straightforward. It calls for a direct comparison of the amount of physical exertion required by the jobs; there is no factor added to compensate for physiological differences between men and women. Based on our careful review of the record before us we cannot say that the district court was clearly erroneous in making this direct comparison and in finding as a fact that heavy cleaning involves "greater effort".

In contrast to most other cases involving janitors, the Second Circuit found that "Columbia's job classifications cannot be equated with the make-weight classifications so frequently found in the prior cases." *Id.* at 961. The few heavy cleaners who performed essentially light cleaner duties worked all night in buildings outside the campus perimeter in a high crime area. Judge Timbers concluded that the working conditions of those heavy cleaners were dissimilar to those of the light cleaners. "Any other interpretation of the Act would deter employers who maintain job classifications in compliance with the Act from taking corrective action once they conclude that some existing security or safety arrangement is unsatisfactory." *Id.* at 962.

In *Marshall v. Marist College,* 14 E.P.D. ¶ 7735 (S.D.N.Y.1977) the Court found that the time and effort expended by custodians, most of whom were male, was greater than that expended by female housekeepers. The housekeepers' duties included sweeping and dust mopping school buildings, emptying and washing small desk wastebaskets, spot cleaning walls, polishing furniture, and distributing supplies. Custodians wet mopped all public areas, cleaned bathrooms, operated power cleaning and vacuuming machines, and moved furniture. In finding the work unequal, the court held that the Secretary had failed to meet his burden of proof under the facts. In *Marist College,*

the two groups of employees were separately classified; additionally, the district court's opinion contains no indication that, in fact, separate duties were not performed by the members of the two groups.

■ Mindful of the Fifth Circuit's admonition that Equal Pay Act issues "must be decided on a case-by-case basis under the facts of each case" and "cannot be decided on an industry-wide basis,"[86] this Court has carefully reviewed the record in this case. In light of the cases explicated above, an examination of that record leads to the conclusion that the Secretary has established a prima facie case of unequal pay for equal work. The work which was actually performed by the male Custodians I and female Custodians II was substantially equal.

Most of the tasks performed by both classes of custodians were identical. The defendant Board required, at the time of hiring, no specific skills of custodial workers in either category. Of the extra duties assigned to Custodians I in the Board's job classification, the record reveals that snow removal, acceptance and distribution of supplies, and heavy lifting were performed so infrequently as to be only peripheral parts of the Custodian I job. Although boiler maintenance does require extra effort, skill, and responsibility, such duties were performed by most custodians on the average of four hours per year.[87] In addition, at least one male Custodian I had no boiler duties whatsoever, yet still received the higher wage. Likewise, the higher wages paid to the Custodians I can not be justified by the fact that the Custodians I performed simple repairs, climbed ladders, and dumped all trash into the dumpsters located outside the school buildings. Five of the Custodians I who testified stated that they did no repairs at all while eight of the Custodians II who testified related that they regularly

made the same repairs and did not receive the higher wage. As for dumping trash, ten of the women who testified stated that they regularly dumped their own trash into the dumpster. Women also regularly used ladders in their cleaning duties, a job supposedly done exclusively by men.

■ The major difference in the work done by the two classes of custodians was the amount of power scrubbing engaged in by the Custodians I. The power scrubbing machines weighed approximately 100 to 150 lbs. Most of the Custodians I did a great deal of power scrubbing during the summer but relatively little during the school year.[88] However, some second shift Custodians I did no scrubbing and still received the higher wages. In addition to the fact that power scrubbing did not involve a significant amount of most of the Custodian I's work time, some Custodians I testified that power scrubbing was actually less tiring than hand mopping. Ronald G. O'Leary, a sales manager for a distributor of power cleaning machines, did testify that transporting such machines about a building could be very physically demanding and that, from his experience, women often experienced more difficulty than men in controlling the machines. But he also stated that it would be *less* tiring to clean two classrooms with a machine scrubber than with a hand mop.

Finally, it appears that the wage differential is not justified by any security functions performed by the male custodians. In *Shultz v. Wheaton Glass Co.,* 421 F.2d 259 (3d Cir.), *cert. denied* 398 U.S. 905, 90 S.Ct. 1696, 26 L.Ed.2d 64 (1970), male selector-packers were paid a ten per cent higher wage than female selector-packers. The defendant attempted to justify the differential on the ground that the males also occasionally performed the clean-up func-

---

86. *Hodgson v. Golden Isles Convalescent Homes, Inc.,* 468 F.2d 1256, 1258 (5th Cir. 1972).

87. Donald Hoag, Chief of Trades and Labor Occupations for the U.S. Civil Service Commission testified that under the Civil Service's rating system punching boiler tubes once a year

would not be sufficient to take the job into a higher classification.

88. In this suit the Secretary is not seeking back wages for work performed during the summer months, but only for work during school terms.

tions of "snap-up boys" in addition to their regular duties. However, the regular "snap-up boys" were paid at a rate only 2 cents per hour more than the female selector-packers, and .0755 cents less per hour than the male selector-packers. Judge Freedman wrote (at 266) that the ten per cent wage differential was not justified by the performance of an extra duty which did not have a corresponding "economic value." [89] The defendant Board of Education hires security guards whose sole function is to patrol the buildings on nights and weekends. Those security personnel are classified in in the same rank as Custodians II and receive the same wage. It would therefore appear that security work does not have an intrinsic economic value sufficient to explain the higher wages received by Custodians I.

In sum, the higher wages paid to Custodians I were not related to any extra duties which the Custodian I employee performed. All Custodians I received the higher wages no matter how many or few of the extra tasks they performed,[90] and no matter how often they performed them. Conversely, the Custodians II always received the lower wage, whether or not they performed any or many of the extra duties. For example, Marion Johnson, a male Custodian I, did no snow removal, did no boiler work, used only a 6 foot ladder to change light bulbs and accepted no deliveries. The only repair jobs which he performed were plunging sinks and toilets. He testified that he did the same work as the females on his shift; yet, he received the higher Custodian I wage. By contrast, Beatrice Meekins, a female Custodian II, performed most of the functions of a Custodian I. She helped unload and distribute supplies, dumped trash, shoveled snow, ran power cleaning machines and had security duties. She also replaced light bulbs and climbed ladders, yet she did not receive the higher wage.

In this case, the Secretary has demonstrated that the higher wages were not related to the number or frequency of extra tasks performed. Since the Secretary has sustained his burden of showing equal work, the Board has the burden of showing that the wage differential was attributable to one of the exceptions specifically spelled out in the Act. The Board argues that a differential based upon a *bona fide* job classification plan is a differential based upon " 'any other factor other than sex,' " *i. e.,* the fourth exception established by the Equal Pay Act and characterized in *Corning Glass Works* as "a catch-all provision." 417 U.S. *supra* at 196, 94 S.Ct. 2229. *See* 29 U.S.C. § 206(d)(1)(iv).[90A]

In *Cayce v. Adams,* 439 F.Supp. 606 (D.D. C.1977), Judge Gesell found that a female federal employee classified as a GS–8 performed work substantially equal to a male employee rated at GS–11. He held (at 608) that the Civil Service classification system would not be a "factor other than sex" unless it were applied in a sex-blind manner. Although Judge Gesell concluded that the classification system operated imperfectly in *Cayce,* he held that it was a valid defense to part of the plaintiff's Equal Pay Act claim during the period that both the government classifiers and plaintiff's supervisor were unaware that the higher paid male employee was performing equal work. Once they knew of the disparity, however, the classification was no longer *bona fide* and the defense evaporated.

In *Cayce,* an individual plaintiff attacked a single instance of disparate classification of employees doing similar work. The validity of the Civil Service classification system *per se* was apparently not under attack. By contrast, in this case the Secretary, on behalf of all employees in a particular classification, challenges the va-

---

**89.** *See also Hodgson v. Behrens Drug Co.,* 475 F.2d 1041, 1049 (5th Cir. 1973), quoting from *Hodgson v. Brookhaven General Hosp.,* 436 F.2d 719, 725 (5th Cir. 1970).

**90.** When presented with the actual work schedules of a first shift male Custodian I and a

female Custodian II at one junior high school, the Board's own job analyst, M. Herbert Mitchell, stated that he would rate the male custodian as a Custodian II.

**90A.** See n.29, *supra.*

lidity of the Board's job descriptions. Once the Secretary has made out a *prima facie* case that the classification system itself has not been followed by the defendant or that the system itself is a violation of the Act, it would be incongruous for the system, in and of itself, to be adjudged a valid defense. The Department of Labor's regulations do not mention job evaluation plans as a possible "factor other than sex." 29 C.F.R. §§ 800.140–800.151. Nor are such plans generally considered to be within the exception.[91] Once the Secretary demonstrates that jobs are substantially equal, then *a fortiori* the job classification plan cannot, simply because it is characterized as *bona fide*, stand in and of itself as a valid defense. *Cf. Usery v. Allegheny County Institution Dist.*, 544 F.2d 148, 153–54 (3d Cir. 1976). Since the Board of Education has not proffered any other "factor other than sex" to explain the wage differential, it has not met its burden of proof to come within an exception to the Act.

Although the Board did come into compliance with the Act after the Secretary filed suit in 1976 and apparently intends to remain in compliance, injunctive relief is still appropriate. "If [the employer] really intends to comply with the Act, its future business conduct will in no way be inhibited by an injunction." *Hodgson v. Approved Personnel Service, Inc.*, 529 F.2d 760, 764 (4th Cir. 1975).

Accordingly judgment will be granted in favor of the plaintiff. Counsel shall confer and present to this Court on or before October 23, 1978, an appropriate decree enjoining defendant from future violation of 29 U.S.C. § 206(d)(1) and directing the payment of back wages owed female Custodians II for the period May 7, 1974 to July 1, 1976. As to back wages and interest thereon, reference is hereby made to paragraph 13 of the Joint Stipulation of Facts filed February 27, 1978 which appears to govern calculation.

---

91. *See generally* Sullivan, *The Equal Pay Act of 1963: Making and Breaking a Prima Facie Case,* 31 Ark.L.Rev. 544, 592–606 (1978), in which the author commented (at 592) that the "catch-all 'any other factor than sex' exception * * * has been the focus of more litigation than the other three enumerated exceptions combined * * *" and listed and discussed those "practices" about which "the cases have tended to cluster" such as training programs (at 592), "economic benefit" (at 595), "shift differentials" (at 600), "temporary reassignments" (at 601), and "other 'other factors'" (at 604). The *bona fides* of a classification plan, does not *per se* constitute such a factor. *See also, generally,* Ross & McDermott, *The Equal Pay Act of 1963: A Decade of Enforcement,* 16 B.C. Inc. & Com.L.Rev. 1, 60–72 (1974).